338 F.2d 1006
 BANKERS LIFE AND CASUALTY COMPANY, a Corporation, Appellant,
v.
C. M. KIRTLEY, Trustee of Automatic Washer Company, Debtor, and Securities & Exchange Commission, and Shareholders Committee, Appellees.
OLSON BROTHERS, INC., Appellant,
v.
C. M. KIRTLEY, Trustee of Automatic Washer Company, Debtor, and Securities & Exchange Commission, and Shareholders Committee, Appellees.
 No. 17711.
 No. 17712.
 United States Court of Appeals Eighth Circuit.
 December 1, 1964.
 
 Wendell B. Gibson, of Gibson, Stewart & Garrett, Des Moines, Iowa, for appellant, Bankers Life & Casualty Co. and S. David Peshkin, of Bridges & Peshkin, Des Moines, Iowa, on the brief.
 Eugene Davis, of Duncan, Jones, Hughes, Riley & Davis, Des Moines, Iowa and F. J. O'Hara, Jr., of Craig, Summers & O'Hara, Washington, D. C., for appellant, Olson Brothers, Inc.
 H. A. Steele, Des Moines, Iowa, for appellee, C. M. Kirtley, Trustee, and W. Z. Proctor and H. M. Coggeshall, Des Moines, Iowa, on the brief.
 Melvin E. Levinson, Chicago, Ill., for appellee, Shareholders Committee of the Automatic Washer Co. and I. Harvey Levinson, Chicago, Ill., on the brief.
 J. Kirk Windle, Sp. Counsel, S. E. C., Chicago, Ill., for S. E. C., Thomas B. Hart, Regional Administrator and Wm. D. Scheid, Atty., S. E. C., Chicago, Ill., and Philip A. Loomis, Jr., Gen. Counsel, David Ferber, Sol., John A. Dudley, Sp. Counsel and Paul J. Kemp, Atty., S. E. C., Washington, D. C., were on the brief.
 Before VOGEL, VAN OOSTERHOUT and MEHAFFY, Circuit Judges.
 VAN OOSTERHOUT, Circuit Judge.
 
 
 1
 Before us are separate appeals taken by Bankers Life and Casualty Co. (Bankers) and Olson Brothers, Inc., from final order subordinating their common stock interests upon liquidation of the assets of the debtor Automatic Washer Co. (Automatic) in a Chapter X bankruptcy proceeding until public shareholders shall have received in redemption of their stock $1.50 per share (par value).[1]
 
 
 2
 Olson Brothers, Inc., is a successor to Bellanca Corporation. As such successor, its rights and liabilities are measured by those of the Bellanca Corporation which was the name of the corporation during most of the time involved in these proceedings.
 
 
 3
 The trial court, in a memorandum opinion reported at 226 F.Supp. 834, sets out the facts, issues and the basis of decision. The trial court entered judgment subordinating the stock interests of Bankers and Bellanca to those of the public stockholders of Automatic.
 
 
 4
 Bankers' points, urged as grounds for reversal, may be summarized as follows:
 
 
 5
 1. The Chapter X reorganization plan was equivalent to liquidation in ordinary bankruptcy and the creditors' claims having been satisfied, surplus funds should be returned to the debtor and the court has no right to determine controversies among the stockholders.
 
 
 6
 2. Payment by Bankers of a judgment obtained against it in Kirtley v. Bankers Life & Cas. Co., D.C., 198 F.Supp. 30, aff'd on condition, 8 Cir., 307 F.2d 418, precludes further relief by way of subordination.
 
 
 7
 3. Subordination would be an inequitable liquidation result and would deprive Bankers of its property without due process of law.
 
 
 8
 Bellanca generally joins in the attack made by Bankers but in addition relies upon somewhat different grounds, thus summarized:
 
 
 9
 1. There is no substantial legally admissible evidence to support a finding that Bellanca was a dominating stockholder at the time of the involved transactions.
 
 
 10
 2. The court erred in holding the transaction between Bellanca and the debtor was not entered into in good faith and was not fair to the debtor.
 
 
 11
 3. No basis exists for the court to exercise its equitable power to order subordination.
 
 
 12
 It will be impossible without unduly extending this opinion to set out in detail the voluminous facts pertaining to this litigation. We will confine ourselves to briefly summarizing the pertinent background material, much of which is common to both appeals. Automatic, a Delaware corporation with its principal place of business at Newton, Iowa, was engaged in the manufacture and sale of washing machines. On November 2, 1956, an involuntary petition praying for reorganization of Automatic, pursuant to Chapter X of the Bankruptcy Act, was filed and approved and a trustee was appointed.
 
 
 13
 On August 9, 1957, the trustee filed a report pursuant to § 167 of Chapter X which, among other things, asserts that the debtor might have substantial claims against former officers, directors and controlling stockholders including among others Bellanca and Bankers, for mismanagement. Much of the information gleaned in the trustee's investigation is summarized in such report.[2]
 
 
 14
 Upon petition of the Securities and Exchange Commission, certain officers, directors and controlling stockholders including the appellants here were enjoined from disposing of their common stockholdings in Automatic upon the basis that such stock interests might be subject to subordination to the public stockholders.
 
 
 15
 The trustee's plan of reorganization, filed pursuant to Chapter X on October 2, 1957, contains a provision for subordinating the stock interests of the appellants and others to the interests of the public stockholders. The plan submitted called for the complete liquidation of the debtor. The records show that the trustee continued to operate the business for a time and that at the outset plans for continuance of the business were explored and considered. The court approved the reorganization plan. In 1957 it appeared doubtful whether any money would be available for distribution to stockholders. Hence the hearing on the subordination of stock issue, although commenced, was continued indefinitely, the court reserving the right to determine such issue if it developed that funds would be available for distribution to stockholders. The plan was accepted by the creditors and approved by the court on February 22, 1958, after due notice and hearing.
 
 
 16
 All creditors have now been paid in full and some $300,000 remains available for payment of costs of administration, the amount of which has not been determined, and for distribution to common stockholders. While the record does not reflect the exact extent of stockholdings, the trial court in its opinion states that there are approximately 2,154,292 shares of the debtor's stock issued and outstanding, of which Bankers owns approximately 642,000 shares and Olson Brothers, Inc., (Bellanca) owns 257,504 shares. Such are sufficient approximations for our purposes. The trial court estimated that the maximum possible recovery for public stockholders will not exceed twenty to thirty cents per share. Such estimate appears to be realistic.
 
 
 17
 After it became apparent that some funds would be available for stockholders, upon the trustee's application the stock subordination issue was set for further hearing, which hearing was held after due notice was given to the interested parties. After full hearing, the court entered the order here appealed from.
 
 
 18
 The appellants urge that since the plan for reorganization approved provided for a complete liquidation, the proceeding is equivalent to an ordinary bankruptcy and that the law applicable to ordinary bankruptcy liquidations applies. Appellants state that in bankruptcy the court is concerned only with the rights of creditors and that once the creditors' rights are satisfied, the remaining assets are returned to the bankrupt and that the bankruptcy court is not concerned with the claims and equities existing among the stockholders. Support for such contention is found in Wheeling Structural Steel Co. v. Moss, 4 Cir., 62 F.2d 37, and others cases. For reasons hereinafter set out, there is no necessity for determining the rule that applies to straight bankruptcy proceedings.
 
 
 19
 This proceeding is under Chapter X of the Bankruptcy Act as amended. Chapter X contains numerous provisions not applicable to conventional bankruptcies. Among them are the following:
 
 Section 196 (11 U.S.C.A. § 596) provides:
 
 20
 "After the approval of the petition the judge shall prescribe the manner in which and fix a time within which the proofs of claim of creditors and of the interests of stockholders may be filed and allowed. * * *"
 
 Section 197 (11 U.S.C.A. § 597) provides:
 
 21
 "For the purposes of the plan and its acceptance, the judge shall fix the division of creditors and stockholders into classes according to the nature of their respective claims and stock. * * *"
 
 
 22
 Section 216(10) (11 U.S.C.A. § 616 (10)) provides:
 
 
 23
 "A plan of reorganization under this chapter — * * * shall provide adequate means for the execution of the plan, which may include: * * * the sale of all or any part of its property, either subject to or free from any lien, at not less than a fair upset price and the distribution of all or any assets, or the proceeds derived from the sale thereof, among those having an interest therein; * * *"
 
 
 24
 Courts have consistently held that a plan for reorganization under the plain language of § 216(10) may include the sale of all or any part of the debtor's assets and have rejected the argument appellants here make. See, e. g., In re American Bantam Car Co., 3 Cir., 193 F.2d 616, 621; In re Chicago Rys., 7 Cir., 160 F.2d 59, 65; In re Lorraine Castle Apartments Bldg. Corp., 7 Cir., 149 F.2d 55, 59; Country Life Apartments, Inc. v. Buckley, 2 Cir., 145 F.2d 935, 938; In re Porto Rican American Tobacco Co., 2 Cir., 112 F.2d 655, 658.
 
 
 25
 Appellants' reliance upon Fidelity Assur. Ass'n v. Sims, 318 U.S. 608, 63 S.Ct. 807, 87 L.Ed. 1032, is misplaced. The Court's decision in that case is based upon several grounds including a finding that the Chapter X petition was not filed in good faith. Sims has been adequately discussed and properly distinguished in the Lorraine Castle Apartments Bldg. Corp. and Country Life Apartments, Inc., cases, supra.
 
 
 26
 In our present case, there is no showing that the petition was not filed in good faith. The record shows that good faith efforts were made to continue the business and reorganization of the corporation. The provisions of Chapter X were in all respects complied with. The reorganization plan was approved by the court and the interested parties as required by statute after due notice and hearing.
 
 
 27
 Section 216(1) (11 U.S.C.A. § 616(1)) provides that a plan of reorganization "may include in respect to stockholders generally or some class of them, provisions altering or modifying their rights, either through the issuance of new securities of any character or otherwise; * * *" Under such statute, a court of bankruptcy exercising its equitable powers has a right to fix the rights and priorities of stockholders in a reorganization proceeding. Taylor v. Standard Gas & Elec. Co., 306 U.S. 307, 323, 59 S.Ct. 543, 83 L.Ed. 669; In re Texas Portland Cement Co., 205 F.Supp. 159, 162.
 
 
 28
 The general equitable principles which govern here are well stated in Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281; Taylor v. Standard Gas & Elec. Co., supra; and In re Kansas City Journal-Post Co., 8 Cir., 144 F.2d 791; and what is said in such cases need not be repeated in detail here. One of the applicable principles is that controlling officers, directors and dominant or controlling stockholders or group of stockholders are fiduciaries. With respect to the obligation of such fiduciaries, the court in Pepper v. Litton, pp. 306-307 of 308 U.S., p. 245 of 60 S.Ct., states:
 
 
 29
 "Their powers are powers in trust. See Jackson v. Ludeling, 21 Wall 616, 624. Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. Geddes v. Anaconda Copper Mining Company, 254 U.S. 590, 599. The essence of the test is whether or not under all the circumstances the transaction carriers the earmarks of an arm's length bargain. If it does not, equity will set it aside. While normally that fiduciary obligation is enforceable directly by the corporation, or through a stockholder's derivative action, it is, in the event of bankruptcy of the corporation, enforceable by the trustee. For that standard of fiduciary obligation is designed for the protection of the entire community of interests in the corporation — creditors as well as stockholders."
 
 
 30
 The trial court found that Bankers and Bellanca were in dominant positions at the time the acts complained of were accomplished and that they had violated fiduciary obligations. Such are findings of fact which cannot be upset unless appellants demonstrate such findings to be clearly erroneous. Tyson v. State of Iowa, 8 Cir., 283 F.2d 802, 809; Pendergrass v. New York Life Ins. Co., 8 Cir., 181 F.2d 136, 137.
 
 
 31
 What we have heretofore said applies generally to the contentions of both appellants. We now turn to consideration of the individual issues raised by each appellant, keeping in mind the general principles heretofore set out.
 
 
 32
 Bankers does not challenge the finding, that it is a dominant stockholder. It places principal reliance upon the fact that it has paid a judgment obtained against it by the trustee for $406,250 compensatory damages resulting from a transaction involving Bankers causing Automatic to exchange Bellanca stock it owned for a note and mortgage worth only $50,000, which deal was consummated. The purported scheme is also alleged to have involved further manipulations which were to place Bankers in a position to acquire 492,500 shares of Automatic stock for a small fraction of its value. Such transaction was not carried out because of difficulty encountered in obtaining registration of the stock. Detailed facts as to such transaction appear in the reported opinions heretofore cited.
 
 
 33
 The defense raises a troublesome problem. We can agree with Bankers that the trustee cannot split his cause of action upon which the previous judgment is based and that res judicata would preclude recovery for any further damages based upon the same cause of action. We are also inclined to agree with Bankers' contention that the fact that the trustee, pursuant to our opinion on appeal in order to avoid a new trial, accepted the option granted and remitted $650,000 exemplary damages awarded by the jury, leaves the trustee with no basis for making any further recovery for exemplary damages. We likewise agree that the trustee's claim that he was out substantial attorneys fees to make the recovery is a part of the cause of action upon which recovery was previously made.
 
 
 34
 The vital problem here presented is whether the subordination which the trustee seeks is the same cause of action as that upon which the previous recovery was based. In Pepper v. Litton, supra, the back-salary claim of an officer charged as a fiduciary had been reduced to judgment in a prior action in the state court. The Supreme Court held subordination of such claim was proper and that res judicata did not prevent the court from subordinating the claim to those of other creditors, stating at pp. 302-303, of 308 U.S. at p. 243 of 60 S.Ct.: "Nor was there presented to the state court the question of whether or not the Litton judgment might be subordinated to the claims of other creditors upon equitable principles." Similarly here, the issue of equitable subordination was not presented nor adjudicated in the prior litigation.
 
 
 35
 Moreover, the prior action by the trustee against Bankers covered only limited transactions reflected by the opinions in such case. In our present case, the court found that Bankers controlled Automatic from about May 8, 1956, until jurisdiction over the debtor was approved by the court. The faithfulness of Bankers to its fiduciary obligations for the entire period of its ownership is here involved. The trial court answered the res judicata argument by stating:
 
 
 36
 "Subordination is not a recovery for wrongdoing, it involves the exercise of the equitable powers of the bankruptcy court in making distribution of the assets of the Debtor. In Re Kansas City Journal-Post Co., supra. The judgment rendered Bankers was limited to the damages arising out of one transaction. The full extent of the injury arising out of the manipulations of the Debtor's affairs by Bankers is difficult to ascertain. Subordination to the public shareholders is fair and equitable. * * *" 226 F.Supp. 834, 836.
 
 
 37
 We believe that there is adequate record support for the finding that Bankers breach of its fiduciary obligation went beyond the isolated transaction involved in the prior judgment.
 
 
 38
 Bankers urges that the transaction involved in the previous litigation is the only wrongful act with which it is charged. The application for subordination makes reference to the report of investigation filed by the trustee. It is not limited to the single transaction. As heretofore pointed out, the burden is upon Bankers to show its good faith and fairness in conducting Automatic's affairs. Our examination of the record satisfies us that the court committed no error in determining that Bankers had not met such burden. There is evidence that Bankers had charged to Automatic $16,000 in air-conditioning equipment not used for any purpose of Automatic and that excessive expense allowances of officers were approved.
 
 
 39
 The basic defense of Olson Brothers, Inc., (Bellanca) is that there is insufficient evidence to support the court's finding that Bellanca had control of Automatic when the transactions in question took place. Olson concedes that Bellanca became a dominant stockholder on March 26, 1956, when 950,000 shares of Automatic stock were issued to it and that it remained a dominant stockholder until May 8, 1956, when Bellanca agreed to sell Bankers 1,112,500 shares of Automatic stock owned by it for $8 per share.
 
 
 40
 The initial block of 950,000 shares was obtained by Bellanca as a result of a contract entered into between Bellanca and Automatic, dated December 23, 1955, for the purchase by Automatic of 105,646 shares of Nelson stock for 950,000 shares of Automatic stock, and a $1,525,000 note of Bellanca issued to Albert and assigned to Automatic in connection with the purchase of 305,000 shares of the debtor by Albert. A modification of the 950,000 stock purchase deal was later agreed upon. Bellanca in a letter dated February 28, 1956, stated in part:
 
 
 41
 "Recognizing that there has been a change in the financial condition of Nelson not in the ordinary and regular course of business and in view of this difference between Nelson's present financial picture and the basis under which you entered into the agreement of December 23, 1955 between us for the purchase of 96.7% of Nelson's common stock, we agree that the Automatic Washer Company $1.50 par value common stock to be delivered to us under Section 4 of the December 23, 1955 agreement shall be 687,500 such shares."
 
 
 42
 Such change in Nelson's status would appear to be adequate to have afforded Automatic a basis for rescinding the contract. Automatic's acceptance of the modification is noted on a letter bearing date of February 28, 1956. Additionally, sometime before the closing date of the Nelson transaction, an agreement was reached for the exchange of the 262,500 shares eliminated above for 100,000 shares of Bellanca stock.
 
 
 43
 Mr. Carmick, an officer and director, testified that he aided in drafting of the agreement and that it was not executed until sometime after February 28 but that he cannot recall the date.[3]
 
 
 44
 It is conceded that Albert at all times here material owned over 80% of the Bellanca stock and that he also held a dominating position in Pierce Governor. Pierce Governor, at least by February 1956, owned 317,000 shares of Automatic and Albert owned 200,000, which put Albert and Pierce Governor jointly in a dominating stockholder position in Automatic. Such status was acquired at least prior to the modification of the 950,000 stock transaction hereinabove described and the agreement for the exchange of Bellanca stock for Automatic stock, all of which occurred subsequent to February 28, 1956.
 
 
 45
 Carmick, an officer and director, testified on cross-examination at the 1957 subordination hearing as follows:
 
 
 46
 "Q. Now, it is a fact, isn't it that after December, 1955, until Bankers Life and Casualty Company entered the picture, Automatic was controlled by Albert and Bellanca, is that right? A. Well, that was my — Yes — that was my opinion."
 
 
 47
 No objection was made to the question when asked. At the close of Carmick's testimony, counsel for Bellanca moved to strike the foregoing testimony without assigning a reason therefor. Upon the resumption of the hearing in 1963 a further attempt was made to strike this testimony. Such objections were not timely.
 
 
 48
 We hold that the court was justified in finding that all of Albert's dealings with the debtor were for Bellanca. Bellanca was the beneficiary of such transactions. While Bellanca at material times was not a stockholder, it associated itself with one exercising control and having fiduciary obligations. In Irving Trust Co. v. Deutsch, 2 Cir., 73 F.2d 121,
 
 
 49
 "But, even if the fact of his agency be disregarded, we think there is an applicable principle which requires him to account, namely, that one who knowingly joins a fiduciary in an enterprise where the personal interest of the latter is or may be antagonistic to his trust becomes jointly and severally liable with him for the profits of the enterprise. Jackson v. Smith, 254 U.S. 586, 589, 41 S.Ct. 200, 65 L.Ed. 418. Cf. Wendt v. Fischer, 243 N.Y. 439, 444,
 
 125, the court states:
 
 50
 154 N.E. 303."
 
 
 51
 It is not without significance that Bellanca shortly thereafter wound up with a controlling stock interest in Automatic.
 
 
 52
 The contention that the court erred in finding the transaction between Bellanca and the debtor was not entered into in good faith and was not fair to the debtor is wholly devoid of merit. The market value of the debtor's stock which was transferred at the time of such transaction far exceeded the value of the property received in exchange. The value of the debtor's stock fixed in the May 8, 1956, contract with Bankers is substantial evidence as to its value as of that time. Automatic in its crippled financial condition was in no position to take on another corporation such as Nelson, whose liquid assets had been siphoned off by Bellanca in the form of dividends. Bellanca, upon the basis of its investment in Nelson, was receiving far more than it was giving in exchange. This improvident transaction doubtless had much to do with weakening Automatic's financial position.
 
 
 53
 It is urged that the rights of the minority stockholders in Bellanca who were innocent of any wrong are entitled to protection. Neither a change in name of a corporation nor a change in its stock or stockholders ordinarily will affect its rights and obligations. A corporation is an entity separate and distinct from its stockholders and its separate entity will generally be recognized. In some situations, equitable circumstances have been found to exist which will warrant piercing the corporate veil. However, the corporate entity will be disregarded only under exceptional circumstances such as where the corporation is a mere shell, serving no legitimate business purpose, and is used principally as an intermediary to perpetrate fraud or promote injustice. See Martin v. United States, 8 Cir., 337 F.2d 171. Here Bellanca served legitimate corporate business purposes. Its stock was traded on the American Stock Exchange. Its separate entity must be recognized.
 
 
 54
 If consideration is given to the position of Bellanca's public stockholders, no compelling reasons are shown why their equities outweigh those of Automatic's public stockholders. The transaction complained of was designed to confer benefits upon Bellanca and hence indirectly upon all of its stockholders. Bankers Life & Cas. Co. v. Bellanca, 7 Cir., 288 F.2d 784, discloses that Bellanca's sale of its recently acquired Automatic stock to Bankers did not work out in accordance with plan, but this does not overcome the fact that Bellanca entered into the Automatic deal with high hopes of large profits.
 
 
 55
 The want of due process point is without merit. The court acted within its jurisdiction under Chapter X. Such chapter provides adequate protection for the rights of all interested parties. No claim is made that proper notice of the various hearings was not given or that any essential steps required by the statute were not taken.
 
 
 56
 The court's findings upon which subordination of the stock interests of Bellanca and Bankers is based are supported by substantial evidence and upon the basis of such findings, the court committed no error in subordinating said stock interests.
 
 
 57
 The judgment is affirmed.
 
 
 
 Notes:
 
 
 [1]
 The interests of certain other stockholders, whose rights are not involved in this appeal, were likewise subordinated
 
 
 [2]
 Some of the history of this litigation appears in the following cases: Ashbach v. Kirtley, 8 Cir., 289 F.2d 159; Kirtley v. Abrams, 2 Cir., 299 F.2d 341; Bankers Life & Cas. Co. v. Kirtley, 8 Cir., 307 F.2d 418; Bankers Life & Cas. Co. v. Bellanca Corp., 7 Cir., 288 F.2d 784
 
 
 [3]
 The S.E.C. finding in an investigation procedure which was introduced as shareholders' exhibit 1, finds that the changes were effected on April 6, 1956. Olson objected to the admissibility of such exhibits. Bellanca was not a party to such hearing. We have serious doubt as to the admissibility of such evidence as against Bellanca and hence give no weight to such evidence