FERGUSON, Circuit Judge.
Claimant Robert Kelce appeals from the entry of judgments on the pleadings against him in two proceedings under Chapter X of the Bankruptcy Act,[1] consolidated on appeal. We affirm both judgments.
I. BACKGROUND
As of December, 1968, Kelce owned a condominium project and an adjacent apartment building in La Jolla, California. That month, Kelce entered into an agreement with the debtor, U. S. Financial Inc.[2] (“USF”) whereby USF obtained an option to purchase Kelce’s La Jolla properties for $5 million. The option agreement specified that USF would pay $1 million down and would sign a $4 million promissory note payable in five equal annual installments and secured by a deed of trust on the property. Subsequently, USF declined to purchase the property in accordance with the terms set out in the option agreement. Instead, USF offered to purchase the property for $1 million down, $3 million Series A redeemable preferred stock (300,000 shares at $10 per share par value) and $1 million in Series B convertible preferred stock (100,-000 shares at $10 per share par value). USF provided Kelce with materially false, misleading and fraudulent[3] financial statements for the three years ending December 31,1968, and Kelce relied on those financial statements in accepting USF’s proposal.
Prior to USF’s collapse, Kelce converted his Series B stock for approximately $1.5 million, thereby realizing a $500,000 profit. Redemptions of Kelce’s Series A preferred stock were made in 1970, 1971 and 1972. No redemptions were made after 1972, and Kelce still owns 120,000 shares of Series A stock.
In 1973, USF filed a petition for arrangement under Chapter XI of the Bankruptcy Act (11 U.S.C.A. § 701 et seq.). At the time of filing, USF still owned four condominium units and the apartment building. The history and collapse of USF is described by Judge Anderson in In Re U. S. Financial Securities Litigation, 609 F.2d 411 (9th Cir. 1979).
II. RESCISSION AND RECLAMATION
On August 29, 1975, Kelce filed a complaint for rescission and reclamation of the property still owned by USF. He also sought reclamation of the proceeds of any sale of that property subsequent to the filing of USF’s Chapter XI petition.
In Late 1975, the Chapter XI proceedings were converted into Chapter X proceedings. Herbert Solomon was appointed and qualified to act as reorganization trustee, and he subsequently filed a motion for judgment on the pleadings or for summary judgment dismissing Kelce’s claim. The bankruptcy court sustained the trustee’s motion for judgment on the pleadings, holding that although Kelce was entitled to partial rescission and reclamation under California law, the absolute priority rule barred any recovery by Kelce. The district court affirmed, and this appeal followed.
*518 A. Title
Kelce contends that the courts below erred in holding that his state law right of rescission is superceded by Chapter X of the Bankruptcy Act. He argues that property is not “property of the debtor”[4] and therefore does not pass into the bankrupt estate if the debtor held voidable rather than nondefeasible title to the property at the time of filing.
It is clear, however that the trustee did acquire title to the property at issue here. Section 186 of the Bankruptcy Act, 11 U.S.C.A. § 586, provides that a Chapter X trustee acquires the same title as a trustee in ordinary bankruptcy receives pursuant to § 70a,[5] 11 U.S.C.A. § 110(a). Contrary to Kelce’s assertions, a trustee in ordinary bankruptcy does take title to property to which the debtor held voidable title, but he takes that title subject to the defrauded party’s claim for rescission and reclamation. See 4A Collier on Bankruptcy 170.41 at 483 (14th ed. 1979).. “[T]he trustee in bankruptcy takes title to the bankrupt’s property subject to the retroactive divestment effected by such a rescission.” (emphasis supplied). A Chapter X trustee, therefore, does take title to property which is subject to a state law for rescission. There is, however, a critical distinction between Chapter X and Chapter XI proceedings which may affect the ultimate disposition of property taken subject to a rescission claim. That distinction is the necessary application of the absolute priority rule in Chapter X proceedings. See Protective Committee v. Anderson, 390 U.S. 414, 441, 88 S.Ct. 1157, 1171, 20 L.Ed.2d 1 (1968); In Re Equity Funding of America Securities Litigation, 603 F.2d 1353, 1356 n. 4 (9th Cir. 1979).
Kelce cites several cases in support of his claim for rescission and reclamation. As the district court noted, however, none of these cases addressed the interaction between the absolute priority rule and the common law right of rescission in Chapter X proceedings. As such, none is controlling here.
In Pearlman v. Reliance Insurance Co., 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962), the Supreme Court held that the debtor’s surety was entitled to recover funds specifically set aside to secure the surety’s obligation. The debtor had no colorable ownership claim to the funds in question, thus the trustee never obtained title at all. Moreover, Pearlman involved an ordinary bankruptcy, and thus the Court was not presented with an opportunity to discuss the absolute priority rule, or a shareholder’s right to rescission and reclamation in the context of a Chapter X reorganization. In fact, the case has only once been applied in a Chapter X case, In re Bruce Construction Corp., 217 F.Supp. 926 (S.D. Fla.1963). Bruce, like Pearlman, involved a surety, and, as in Pearlman, the Bruce debt- or had no colorable claim to title over the fund.
Similarly, none of the Ninth Circuit cases cited by Kelce involved Chapter X proceedings and they therefore do not discuss the absolute priority rule. In Matter of Paderewski, 564 F.2d 1353 (9th Cir. 1977), a trustee in ordinary bankruptcy claimed title to a one-half interest in a community property residence. An interlocutory divorce decree, which had not been appealed and which therefore had become final, had not awarded each party a one-half interest in the residence. Since the bankrupt did not have a one-half interest, the trustee did not receive a one-half interest. Again, this was not a Chapter X case. Moreover, the *519 bankrupt clearly did not have title to one-half of the property in issue, and neither, therefore, did the trustee. In contrast, USF did not have title to the property in issue here, however defective, and the trustee was vested with that title.
In re Forester, 529 F.2d 310 (9th Cir. 1976), involved the subrogation of a second lien holder’s claims to collateral to those of a first lien holder. This court made clear that the trustee in ordinary bankruptcy is vested with the bankrupt’s title at the moment of bankruptcy. Id. at 316. Our holding is not inconsistent with that maxim.
In re Telemart Enterprises, Inc., 425 F.2d 761 (9th Cir. 1975), cert. denied, Holzman v. Alfred M. Lewis, Inc., 424 U.S. 969, 96 S.Ct. 1466,47 L.Ed.2d 736 (1976), concerned reclamation under the Uniform Commercial Code by a seller of goods to a bankrupt purchaser. While we held that a seller could reclaim goods when a bankrupt received voidable title, we were not faced with a Chapter X reorganization and thus did not have to resolve the absolute priority issue. As discussed below, that rule changes the focus of our inquiry and mandates that we refuse to permit Kelce to reclaim the property and proceeds at issue.
B. The Absolute Priority Rule
The Supreme Court has long recognized that a reorganization plan cannot be “fair and equitable,” as it must be before it can be approved[6] or confirmed,[7] if it fails to comply with the absolute priority rule. Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 115-19, 60 S.Ct. 1, 7-9, 84 L.Ed. 110 (1939); Protective Committee v. Anderson, supra, 390 U.S. at 441, 88 S.Ct. at 1171. This rule requires that
[beginning with the topmost class of claims against the debtor, each class in descending rank must receive full and complete compensation for the rights surrendered before the next class below may properly participate.
6A Collier on Bankruptcy, If 11.06 at 210-11 (14th ed. 1979) (citations omitted).
We cannot square the absolute priority rule with Kelce’s claim for rescission and reclamation. Were we to allow his claim, we would be permitting Kelce to transform his claim as a defrauded shareholder into a secured claim, in derogation of the rights of senior classes and in violation of the absolute priority rule.
The absolute priority rule is designed to vindicate the reasonable expectations formed by claimants when their investments or loans were made. Matter of Stirling Homex Corp., 579 F.2d 206, 214 (2d Cir. 1978), cert. denied, Jezarian v. Raichle, 439 U.S. 1074, 99 S.Ct. 847, 59 L.Ed.2d 40 (1979); Slain & Kripke, The Interface Between Securities Regulation and Bankruptcy-Allocating the Risk of Illegal Securities Issuance Between Security Holders and the Issuer’s Creditors, 48 N.Y.U.L.Rev. 261, 286-87 (1973) (“Slain & Kripke”); Huff, The Defrauded Investor in Chapter X Reorganizations: Absolute Priority v. Rule lob-5, 50 Am.Bankr.L.J. 197, 204 (1976); Note, The Proposed Bankruptcy Act: Changes in the Absolute Priority Rule for Corporate Reorganizations, 87 Harv.L.Rev. 1786, 1790 (1974). In the instant case, those expectations will not be vindicated — instead, they will be violated — by allowing rescission and reclamation. Kelce is in reality seeking relief from the general unsecured creditors of the corporation. Because of USF’s insolvency and ultimate liquidation, the percentage which the general creditors would realize would be reduced were Kelce allowed to rescind and reclaim. The absolute priority rule will not tolerate this eventuality. Matter of Stirling Homex Corp., supra, 579 F.2d *520 at 213; Scott v. Abbott, 160 F. 573, 581 (8th Cir.), cert. denied, 212 U.S. 571, 29 S.Ct. 682, 53 L.Ed. 655 (1908).
. Professors Slain and Kripke have analyzed the expectations of shareholders and creditors. They point out that shareholders accept two risks: the risk of business insolvency and the risk of illegality in securities issuance. General creditors also accept the risk of insolvency, but they expect that their claims will be given priority in the event of bankruptcy. The expectation of priority is implicit in their contracts with the issuer. Id. at 286. Shareholders bargain for equity-type rewards in exchange for equity-type risks, but general creditors do not:
In theory, the general creditor asserts a fixed dollar claim and leaves the variable profit to the stockholder; the stockholder takes the profit and provides a cushion of security for payment of the lender’s fixed dollar claim. The absolute priority rule reflects the different degree to which each party assumes a risk of enterprise insolvency; no obvious reason exists for reallocating that risk.
Slain & Kripke, supra, 48 N.Y.U.L.Rev. at 286-87.
Kelce argues that he did not bargain for equity type risks because he received preferred stock. We note, however, that Kelce sold his Series B stock at a profit of $500,-000. While Kelce lost money on his transactions with USF taken as a whole, he clearly took advantage of his shareholder position in converting his Series B stock. We will not allow Kelce to benefit from his shareholder status when he may opt out of that status when he chooses. We note that “[w]hen a corporation becomes bankrupt, the temptation to lay aside the garb of a stockholder, on one pretense or another, and to assume the role of a creditor, is very strong, and all attempts of that kind should be viewed with suspicion.” Newton National Bank v. Newbegin, 74 F. 135, 140 (8th Cir. 1896), cited in Matter of Stirling Homex Corp., supra, 579 F.2d at 213. Moreover, we view the Series B transaction as an indication of Kelce’s gaining equity-type rewards, and therefore as an indication of his acceptance of equity-type risks.
It is also appropriate to impose the risk of illegality in securities issuance on shareholders, even though their investment may be based on an inaccurate picture of the corporation garnered from false financial statements.
When the rescission right is enforced in bankruptcy or reorganization the effect is to allocate [the risk of illegality in securities issuance] to general creditors. It is difficult to conceive of any reason for shifting even a small portion of the risk of illegality from the stockholder, since it is to the stockholder, and not to the creditor, that the stock is offered.
Slain and Kripke, supra, 48 N.Y.U.L.Rev. at 288.
This scheme of risk allocation is particularly appropriate in the instant case. Initially, every creditor and stockholder was victimized by the massive fraud perpetrated by USF.[8] In view of the extent of the fraud, it is equitable to impose the risks of insolvency and illegality on those whose investment, by its very nature, is a risky one.[9] Secondly, as noted by the bankruptcy judge in his conclusions on Kelce’s claim for parity with general unsecured creditors,[10] Kelce’s transactions presented USF with an opportunity to perpetrate its fraud:
Had the transaction been concluded as originally structured, that is as a sale on a promissory note secured by a Deed of Trust on the property sold, USF would have shown the value of the property on the asset side subject to the liability on the note. Here however, because of the exchange of the property for stock, it made it possible for USF to show the asset free of encumbrances and in addi *521 tion USF had the ability to show on its capital contribution side the share[s] of stock which could have misled creditors into thinking additional capital had been contributed. In other words, Kelce gave USF the opportunity (whether it used it or not) to flail with a double edged sword in preparing its financial statements.
As between the creditors and Kelce, then, Kelce is the lesser innocent, and Kelce should not be allowed to reclaim the property at issue at the senior creditors’ expense.
Based on the above analysis, we conclude that the absolute priority rule would be rendered meaningless were we to allow Kelce to rescind and reclaim.[11] The context of the instant case is crucial to our holding; when all are defrauded, it is manifestly unfair to allow one shareholder to benefit from that fraud at the others’ expense.
III. PARITY WITH GENERAL UNSECURED CREDITORS
In the second case before this court, Kelce contends that he deserves parity with general unsecured creditors since he is a preferred shareholder asserting fraud claims. We disagree and affirm the courts below.
Kelce filed a proof of claim in February, 1976, after USF’s Chapter XI proceedings were converted to Chapter X proceedings. The claim, as later amended, averred that Kelce had been defrauded by USF in the sale of USF’s preferred shares to him. Kelce sought general unsecured creditor status for the difference in value between the price paid for the Series A stock and the value of the unredeemed shares. (If Kelce were granted parity with the general unsecured creditors, he would receive compensation far in excess of that he would receive as part of the class which includes defrauded shareholders.)
The trustee subsequently filed a reorganization plan which contemplated the liquidation of USF. As amended, the plan divides USF’s creditors and stockholders into several classes.- Only three of these classes are *522 relevant to our discussion: Class 5B, which includes general unsecured creditors’ claims, Class 6, which includes defrauded subordinated debenture holders’ claims, and Class 7, including defrauded shareholder claims.[12] Classes 5B and 6 were created as a result of a compromise, which provided that the defrauded equity holders were to accept a lower rank than the general unsecured creditors. In return, they were relieved of their burden of proving that they were actually defrauded. Kelce did not participate in these negotiations, and he subsequently objected to approval of the plan. Kelce then entered into a stipulation with the trustee which provided that no provision of the plan would prevent Kelce from obtaining Class 5B status.[13] The plan was confirmed, Kelce filed an amended claim for $1,887,155, and the trustee objected.
Both the bankruptcy court and the district court below held that Kelce is properly a member of Class 7. We agree.
Section 197 of the Bankruptcy Act, 11 U.S.C.A. § 597, requires the bankruptcy judge to “fix the division of creditors and stockholders into classes according to the nature of their respective claims and stock.” This provision “accords the court a broad latitude in classification of creditors, and classification should be based on substantial differences in the nature of claims.” Scherk v. Newton, 152 F.2d 747, 751 (10th Cir. 1945). The requirement that classes be fixed “according to the nature of their respective claims” requires courts to recognize differences in the rights of creditors which mandate differences in treatment. Matter of Stirling Homex Corp., supra, 579 F.2d at 211, citing Scherk v. Newton, supra, 152 F.2d at 750.
Kelce argues that the absolute priority rule has nothing to do with membership in a class of creditors. We disagree. The absolute priority rule would be rendered meaningless if inferior claimants were classified with superior claimants. Courts would then have no basis for ranking claims as “senior” or “junior.” It is true that reorganization courts are
given a discretionary power of classification to be exercised as the exigencies of each individual case require. * * * * % *
Nevertheless, the power of the reorganization court thus broadly defined has certain limits which are always present. The foremost of these is the “fixed principle” or “absolute priority” rule of the Boyd case which governs all reorganization plans in determining whether they are fair and equitable. This means that in classifying the various claims and interests, the classes established must be accorded the priority rank to which their claims and interests against the estate entitle them, and the principle of absolute priority may not be violated by any scheme of classification which places *523 claimants of different rank in the same category for treatment.
6 Collier on Bankruptcy (Pt. 2) 19.10 at 1596-97 (14th ed. 1979) (emphasis supplied).
As discussed in Section II, supra, the nature of Kelce’s claim is significantly different from that of a general unsecured creditor. Kelce, for example, realized a $500,000 profit on the sale of his Class B preferred stock. As the bankruptcy judge below noted, Kelce’s interest
smacks of an equity investment with the gains attendant thereto .
Kelce’s position appears to be that he was satisfied to be an equity holder while things were going well, but now that things have turned sour, he wants another position, that of a general creditor.
That position seems patently unfair and inequitable to the general creditor body.
Kelce cannot be included in Class 5B because of the nature of his claim. It is true that the reorganization plan itself designates defrauded shareholders as creditors. But all unsecured creditors need not be classified together. In fact, they may not be classified together if certain claims “are of such a nature as to give them some right of priority or preference over other claimants. These creditors, then, must be separately classified and accorded the priority to which they are entitled.” 6 Collier on Bankruptcy (Pt. 2) 19.13 at 1620-21 (14th ed. 1979).
Kelce contends that his claim properly belongs in Class 5B by virtue of the Supreme Court’s decision in Oppenheimer v. Harriman National Bank, 301 U.S. 206, 57 S.Ct. 719, 81 L.Ed. 1042 (1937). He argues that his inclusion in Class 7 therefore necessarily constituted subordination without cause. We agree with the Second Circuit, however, in concluding that Oppenheimer is not controlling here. See Matter of Stirling Homex Corp., supra, 579 F.2d at 211 n.8. Furthermore, we hold that Kelce’s Class 7 classification was proper[14] and that there was, therefore, no exercise of the courts’ powers of equitable subordination.[15]
The Oppenheimer claimant bought stock in a bank in 1930. The bank subsequently closed, and, during liquidation, Oppenheimer sued for rescission based on fraud. He obtained a money judgment, but the Second Circuit ordered that he not be paid until all creditors’ claims had been satisfied. The Supreme Court reversed, holding that Oppenheimer’s claim was entitled to parity with other unsecured creditors’ claims. Oppenheimer, supra, 301 U.S. at 215, 57 S.Ct. at 724. Significantly, the Oppenheimer decision was based on the National Bank Act, 12 U.S.C. § 1 eü seq., which requires “ratable” and not “fair and equitable” distribution. Two years after the Oppenheimer decision, the Supreme Court held that the *524 “fair and equitable” standard required adherence to an absolute priority rule in Case v. Los Angeles Lumber Products Co., supra, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939).[16] Our conclusion that Oppenheimer is not controlling here is bolstered by two subsequent Supreme Court opinions in which the question of defrauded shareholder’s proper ranking was left unanswered. See Protective Committee v. Anderson, supra, 390 U.S. at 423 & n.8, 453, 88 S.Ct. at 1162 & n.8; Tcherepnin v. Knight, 389 U.S. 332, 346, 88 S.Ct. 548, 558, 19 L.Ed.2d 564 (1967). Moreover, as discussed infra, there would have been no compromise necessary here had this question been authoritatively resolved by Oppenheimer.
Given the significant differences set out above between Kelee’s claim and the claims of the general unsecured creditors, we cannot hold that the classification scheme devised here violates § 197 or § 221(2). We are not holding that a defrauded shareholder may never be classified with general unsecured creditors. We merely hold that, given the particular facts of this case, the absolute priority rule would be violated if Kelce were granted Class 5B status.[17] We note again the massive fraud which victimized every USF shareholder and creditor. We could not countenance a classification scheme whereby Kelce would, by virtue of the fraud here, be allowed to share equally with defrauded unsecured creditors who expected priority in the event of insolvency. Since the relative expectations of the parties would not be realized were Kelce included in Class 5B, the absolute priority rule will not allow us to permit that classification.
The Second Circuit recently reached much this same conclusion in Matter of Stirling Homex Corp., supra, 579 F.2d 206, when it held that defrauded shareholders could fairly and equitably be classified below general unsecured creditors. The court relied on several theories in reaching its conclusion: it stressed the necessity of classifying claims according to the priority to which they are entitled; the varying expectations of equity holders and of creditors, and the general equity powers of reorganization courts. Id. at 213-14.[18] While we do not decide the instant case on equity grounds, we find support for our holding in the Second Circuit’s recognition of the im *525 portance of recognizing differences in expectations when classifying claims against the debtor.
An argument might be made that Kelce, as a defrauded preferred shareholder, was entitled to priority over the defrauded common shareholders. In Petition of Portland Electric Power Co., 162 F.2d 618 (9th Cir.), cert. denied, 332 U.S. 837, 68 S.Ct. 217, 92 L.Ed. 410 (1947), for example, we held that the rights of preferred stockholders must be recognized in bankruptcy proceedings. Id. at 622. The stockholders in Portland, however, were classified as stockholders, not as creditors whose claims were based on fraud. Moreover, Kelce is not arguing that he is entitled to a different classification from that of defrauded common shareholders; he contends that he more properly belongs in Class 5B than in Class 7. As presented to us, our task is to determine which of those two classes should more properly include Kelce.[19] As such, we have determined that Kelce was correctly placed in Class 7. In addition, we note that due to USF’s insolvency, none of the equity holders would receive any compensation were it not for the compromise negotiated by the trustee and the other equity holders. Classifying Kelce with the common shareholders, therefore, does not do violence to the provisions of the Bankruptcy Act.
Finally, we note that Congress has now expressly provided that defrauded shareholders’ claims be classified below those of general unsecured creditors. See § 510 of the Bankruptcy Reform Act of 1978, 11 U.S.C.A. § 510(b) (1979).[20]
Accordingly, we AFFIRM.

. 11 U.S.C.A. § 501 et seq. (1970). These actions were brought under the Bankruptcy Act of 1898, as amended. That Act has since been revised by the Bankruptcy Reform Act of 1978, Pub.L. 95-598. Unless otherwise noted, all references to the provision of the Bankruptcy Act contained herein refer to the Bankruptcy Act of 1898, as amended.

. Shortly after U. S. Financial, Inc. filed its petition for an arrangement under Chapter XI, several of its subsidiaries filed similar petitions. All proceedings were consolidated for joint administration. As used herein, all references to “USF” refer to U. S. Financial, Inc. and its affiliates.

. The courts below, in ruling on the trustee’s motions for judgments on the pleadings, were required to accept Kelce’s allegations of fact as true. Austad v. United States, 386 F.2d 147, 149 (9th Cir. 1967). In reviewing their decision, we also assume the truth of Kelce’s allegations, and we therefore assume that Kelce is a defrauded shareholder, having relied on materially false, misleading, and fraudulent financial statements supplied by USF.

. See 11 U.S.C.A. § 616, which provides in pertinent part:
A plan of reorganization under this chapter- ♦ * * * * *
(2) may deal with all or any part of the property of the debtor ....

. Section 70(a), 11 U.S.C.A. § 110(a), provides in pertinent part:
The trustee of the estate of a bankrupt . . upon his . . appointment and qualification, shall in turn be vested by operation of law with the title of the bankrupt as of the date of the filing of the petition initiating a proceeding under this title

. See section 174, 11 U.S.C.A. § 574, which provides in pertinent part:
the judge shall enter an order approving the plan or plans which in his opinion comply with the provisions of section 616 of this title, and which are fair and equitable, and feasible

. See section 221, 11 U.S.C.A. § 621, which provides in pertinent part:
The judge shall confirm a plan if satisfied that— ******
(2) the plan is fair and equitable, and feasible

. See Huff, The Defrauded Investor, supra, 50 Am.Bankr.L.J. at 202-03 for a discussion of USF’s pre-petition activities.

. Moreover, it would be manifestly unfair, in light of the extent of the fraud here, to allow Kelce to obtain secured creditor status merely because he received stock for real property and a portion of that property remained in USF’s possession at the time of filing.

. See discussion infra.

. Kelce also points out that the commentators cited by the courts below stress the rehabilitative aspects of Chapter X reorganization plans in formulating their conclusions. He argues that the rationales relied on by those commentators do not apply to a Chapter X plan of reorganization the goal of which is liquidation rather than rehabilitation. We decline to make that distinction. The term “reorganization plan” encompasses both plans which envision rehabilitation and those whose goal is liquidation. See, e. g., United States v. Key, 397 U.S. 322, 323, 90 S.Ct. 1049, 1051, 25 L.Ed.2d 340 (1970): “The [reorganization] plan, an atypical one for a corporate reorganization, does not contemplate the continued existence of the debtor as a going concern, but amounts in substance to a liquidation.” Other courts have consistently noted that a Chapter X reorganization plan may provide for liquidation and, if so, the same rules are to be applied as would be were rehabilitation the ultimate goal. Appellants in Bankers Life & Casualty Co. v. Kirtley, 338 F.2d 1006 (8th Cir. 1964), for example, urged that ordinary bankruptcy provisions be applied in a Chapter X reorganization which envisioned complete liquidation. The court disagreed, recognizing that “Chapter X contains numerous provisions not applicable to conventional bankruptcies,” id. at 1009, including § 216(10), 11 U.S.C.A. § 616(10), which allows liquidation.
In addition, the eventual outcome of Chapter X proceedings may not be clear at their outset. The reorganization trustee involved in Matter of Stirling Homex Corp., supra, 579 F.2d 206, for example, “originally intended to formulate a plan or reorganization under which Homex would continue operations. Borrowing proved impossible, however, as did merger with or acquisition by a financially sound company. He thus began the Herculean task of liquidating Homex’s assets.” Id. at 209 n.4. It might well prove impossible to reorganize a corporation were we to provide for the application of different rules and standards to plans providing for rehabilitation than we require for plans providing for liquidation. A trustee in a Homex situation, where the goal of the plan changed over time, would then have to comply with two different sets of standards. Such confusion is unwarranted.
Finally, as we have noted, the absolute priority rule was designed to reward expectations. Those expectations are formed at the time of investment or loan, and by definition are not affected by the ultimate goal of a reorganization plan. We would do violence to the provisions of Chapter X were we to recognize such a liquidation-rehabilitation distinction, and we decline to do so.

. A “creditor” for purposes of the Bankruptcy Act is a “holder of any claim,” § 106(4), 11 U.S.C.A. § 506(4). Claims are defined to “include all claims of whatever character against a debtor or its property, except stock, whether or not such claims are provable under section 103 of this title and whether secured or unsecured, liquidated or unliquidated, fixed or contingent,” § 106(1), 11 U.S.C.A. § 506(1) (emphasis supplied). The reorganization plan for the liquidation of USF, as approved by the bankruptcy court, provides that the defrauded shareholders are creditors. For purposes of this opinion we assume, without deciding, that defrauded shareholders can be creditors. See Matter of Stirling Homex Corp., supra, 579 F.2d at 212.

. The stipulation provides in pertinent part:
Herbert J. Solomon, the duly qualified and acting Trustee . and Robert D. Kelce by their respective undersigned counsel, hereby stipulate and agree as follows:
1. Approval of the Trustee’s Restated Amended Consolidated Plan of Reorganization ... is without prejudice to, or waiver of, the right of Kelce to contend or prove that Kelce should be classified as a member of Class 5B of the Plan and that he should receive all distributions allocable to him as a member of Class 5B.
2. Paragraph 1 of this Stipulation is meant by the parties to remove any provision of the Plan as a defense to the possible change of classification contemplated thereby and shall not be construed as a waiver by the Trustee of any defenses he may otherwise have to such classification change.

. This court has upheld the classification of rescission claims with claims of “holders of promissory notes which are unsecured . . .”
In re Los Angeles Land & Investments, Ltd., 282 F.Supp. 448, 454 (D.Hawaii 1968), aff’d, 447 F.2d 1366 (9th Cir. 1971) (per curiam). That case involved land sales based upon unregistered publicly offered contracts, and is easily distinguishable from the instant case. The rescission claims in Los Angeles Land were held by those who had contracted to purchase land, and not by shareholders who had acquired equity. Moreover, the Los Angeles Land trustee recommended, and the courts approved, the classification at issue there. We have noted that reorganization courts have broad discretion in classifying creditors and stockholders. We concluded that the Los Angeles Land classification was acceptable based on the facts of that case and the application of the absolute priority rule. In the instant case, the trustee carefully recommended separate classification for defrauded shareholders and general unsecured creditors, and we have concluded that that classification is the appropriate one. "

. We have not subordinated Kelce’s claim, nor have the courts below. Kelce is responsible for his classification here. Kelce, unlike the general unsecured creditors, had control over the manner in which he was paid for his property. As noted above, Kelce provided USF with an opportunity to further perpetrate its fraud. Furthermore, Kelce converted his Class B stock at a sizeable profit, thereby accepting the rewards of an equity holder. By originally accepting preferred stock, Kelce accepted a position subordinate to that of general creditors. We would be' unjustifiably subordinating the ordinary unsecured creditors were we to include Kelce’s claim within Class 5B.

. The court in Case applied the “fixed principle” of Northern Pacific Railway Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913).

. At oral argument, Kelce’s counsel argued that the reliance by the courts below on the absolute priority rule was misplaced. If that rule bars all equity holders from being classified with general unsecured creditors, he argued, there would have been no basis for a compromise here. We disagree. The question of whether defrauded shareholders may achieve parity with ordinary unsecured creditors was clearly an open question at the time of compromise. See Protective Committee v. Anderson, supra, 390 U.S. at 423 & n.8, 453, 88 S.Ct. at 1162 & n.8, 1177; Tcherepnin v. Knight, supra, 389 U.S. at 346, 88 S.Ct. at 558. (In fact, Kelce’s argument that Oppenheimer mandates the equal treatment of defrauded shareholders and general unsecured creditors, if valid, would also negate any reason for compromise.) See also Matter of Equity Funding Corp. of America, 416 F.Supp. 132, 151 (C.D. Cal. 1975):
There is authority for the proposition that a fraud claim, even if based upon stock acquisition, is on a parity with general unsecured claims in a reorganization proceeding. Acceptance of this proposition would probably violate the expectations of all parties, because stockholders ordinarily are entitled to no recovery from an insolvent company.
This bona fide issue has not been authoritatively resolved.
In light of this dispute, it was not unreasonable for the trustee and the other equity holders to negotiate a compromise. Trustees have long utilized compromises in avoidance of litigation, Protective Committee v. Anderson, supra, 390 U.S. at 424, 88 S.Ct. at 1163, and the compromise negotiated here was correctly held to satisfy the requisite “fair and equitable” standard.
Furthermore, as outlined above, we are not holding that defrauded shareholders may never be classified with general unsecured creditors. Our holding is limited to the facts of this case.

. This court noted the Stirling Homex decision in In re Equity Funding of America Securities Litigation, 603 F.2d 1353 (9th Cir. 1979). While we neither rejected nor approved the decision, we characterized its holding that defrauded shareholders should be classified beneath ordinary unsecured creditors as the “majority rule.” Id. at 1356 n.5.

. At oral argument, petitioner’s counsel suggested that preferred shareholders are more similar to subordinated debenture holders than they are to common shareholders. This argument was not presented to the courts below and is not properly before us. In addition, we note that the stipulation signed by Kelce and the trustee allowed Kelce to attempt to show that he should have been included in Class 5B, not in Class 6.
In addition, counsel for Kelce argued that the rulings of the courts below amounted to a rescission of the stipulation between the trustee and Kelce. This argument borders on the frivolous.
The stipulation provided that Kelce could attempt to prove that he more properly belonged in Class 5B. He was allowed to make that attempt; as such, he was not precluded from making an attempt by virtue of an existing, approved plan. The stipulation did not mandate that Kelce be included in Class 5B; it merely allowed him to raise the claim.

. Section 510 of the Bankruptcy Reform Act of 1978 provides in pertinent part:
(b) Any claim for recission [sic] of a purchase or sale of a security of the debtor or of ' an affiliate or for damages arising from the purchase or sale of such a security shall be subordinated for purposes of distribution to all claims and interests that are senior or equal to the claim or interest represented by such security.
(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may-
(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest