579 F.2d 206
 In the Matter of STIRLING HOMEX CORPORATION, Debtor.
Gregory JEZARIAN, Geraldine Jezarian, Lonetown Company,
Harry E. Jones, Aleck Goldberg, as Custodian for
Mark Goldberg, and Mrs. D. Windsor
Dixon, Appellants,
v.
Frank G. RAICHLE, Reorganization Trustee, Lincoln First Bank
of Rochester, Chemical Bank, the Chase Manhattan Bank, N.
A., the First National Bank of Chicago, Marine Midland Bank,
the Travelers Indemnity Company, and the Securities and
Exchange Commission, Appellees.
 Nos. 598, 896, Dockets 77-5019, 77-5022.
 United States Court of Appeals,
Second Circuit.
 Argued March 20, 1978.
Decided June 19, 1978.
 
 Robert B. Block, New York City (Pomerantz, Levy, Haudek & Block, New York City, of counsel), for appellants Gregory Jezarian, Geraldine Jezarian and Lonetown Company.
 I. Walton Bader, New York City (Bader & Bader, New York City, of counsel), for appellant Mrs. D. Windsor Dixon.
 Milberg, Weiss, Bershad & Spechtrie, New York City, of counsel, for appellants Harry E. Jones and Aleck Goldberg, as Custodian for Mark Goldberg.
 Irving H. Picard, Asst. Gen. Counsel, S. E. C., Washington, D. C. (David Ferber, Sol. to the Commission, S. E. C., Washington, D. C., Marvin E. Jacob, Associate Administrator, S. E. C., New York Regional Office, New York City, of counsel), for appellee Securities and Exchange Commission.
 Frank G. Raichle, Buffalo, N. Y. (Byron Johnson, Johnson, Reif & Mulligan, P. C., Rochester, N. Y., of counsel), for trustee-appellee Frank G. Raichle.
 Henry L. Goodman, New York City (Zalkin, Rodin & Goodman, Richard S. Toder, Andrew D. Gottfried, New York City, Sherman I. Goldberg, Chicago, Ill., of counsel), for appellees, Chemical Bank and The First National Bank of Chicago.
 Alexander C. Cordes, Buffalo, N. Y. (Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N. Y., of counsel), for appellee Marine Midland Bank.
 Nixon, Hargrave, Devans & Doyle, Rochester, N. Y., of counsel, for appellee Lincoln First Bank of Rochester.
 Milbank, Tweed, Hadley & McCloy, John J. Jerome, Barry G. Radick, Michael J. Levin, Patrick E. Mears, New York City, of counsel, for appellee The Chase Manhattan Bank, N. A.
 Brown, Kelly, Turner, Hassett & Leach, Buffalo, N. Y. (Frederick D. Turner, Buffalo, N. Y., of counsel), for appellee The Travelers Indemnity Company.
 Before KAUFMAN, Chief Judge, and MULLIGAN and MESKILL, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 This appeal raises questions concerning the proper status of allegedly defrauded investors in reorganization proceedings under Chapter X of the Bankruptcy Act. The principal issue is whether claims filed by allegedly defrauded stockholders of a debtor corporation should be subordinated to claims filed by that corporation's ordinary unsecured creditors for purposes of formulating a reorganization plan. Judge Harold P. Burke of the United States District Court for the Western District of New York held that they should be, and we affirm.
 
 
 2
 The debtor in this case is Stirling Homex Corporation ("Homex").[1] As recently explained by this Court, "Homex manufactured and assembled prefabricated multi-family modular housing. Its operations consisted of mass-producing individual apartment units, or 'modules,' using assembly-line production techniques, shipping them to a construction site and installing them in a previously-constructed concrete and steel frame so as to form multi-unit apartment buildings." United States v. Stirling, 571 F.2d 708, 712 (2d Cir. 1978), Petition for cert. filed, 46 U.S.L.W. 3723 (U.S. May 1, 1978). The nature of Homex's actual operations, however, did not reflect the basically sound and straightforward character of the corporation's underlying concept. Instead, its operations included "land transactions that were not what they were claimed to be, labor relations that were not only inappropriately 'cozy' but undisclosed, contracts for module sales based on guile and trickery rather than agreement, and deceptive bookkeeping practices . . . ." 571 F.2d at 713. Key officials of the corporation "engaged collectively in a calculated and multi-faceted plan to give the investing public the false impression that Homex was in a sound and steadily improving financial position and at the same time withhold adverse information that was material to an accurate appraisal of the company's prospects." 571 F.2d at 713-14.[2]
 
 
 3
 On July 12, 1972, after Homex had been in business for approximately four years, reorganization proceedings were voluntarily initiated in the Western District of New York under Chapter X of the Bankruptcy Act, 11 U.S.C. § 501 Et seq.[3] Nearly five years later, in July of 1977, Judge Burke determined that the fair market value of Homex's assets was $16,986,376 and that Homex's debts amounted to $45,961,000.[4] Accordingly, he found Homex insolvent and declared that Homex stockholders had no equity in the corporation and could neither vote on a plan of reorganization nor share in the distribution of proceeds resulting from the liquidation of Homex's assets. Judge Burke then ordered the Trustee to prepare and submit a plan for such a distribution.
 
 
 4
 That same month, at the request of the Trustee and with the consent of the stockholders, Judge Burke filed a written decision in which he held that the claims of allegedly defrauded stockholders, some of whom had begun proceedings against Homex and its officers for violations of federal securities laws,[5] were subordinate to those of Homex's general unsecured creditors. Relying on § 197 of the Bankruptcy Act, 11 U.S.C. § 597, and Bankruptcy Rule 10-302(a), Judge Burke ordered that claims by "those creditors whose claims are grounded on fraud or securities law violations committed upon them as stockholders" be subordinated. In so doing, he made the following observations:
 
 
 5
 If the claims of alleged defrauded stockholders are not subordinated to the claims of conventional general unsecured creditors, a wholly new element will have been created in the financial structure of business. No longer will creditors, whether banks, suppliers, or subcontractors, be free as they now are to extend credit to the ordinary course of business on their presumed right to be accorded priority over the claims of investors and speculators in securities, without first obtaining a secured basis which will guarantee them a priority status in the event their customer defaults. Such a fundamental change in the financial structure of the business community is unwarranted in the absence of legislation designed to overturn the long established rule of absolute priority.
 
 
 6
 . . . I find that (it) is fair and equitable that the class of conventional general creditors take precedence over the class of alleged defrauded stockholder claims.
 
 
 7
 Defrauded stockholder claimants in the purchase of stock are presumed to have been bargaining for equity type profits and assumed equity type risks. Conventional creditors are presumed to have dealt with the corporation with the reasonable expectation that they would have a senior position against its assets, to that of alleged stockholder claims based on fraud. They may be presumed to have bargained for debt type profits and certainty of payments.
 
 
 8
 For the reasons that follow, we affirm Judge Burke's order.[6]
 
 DISCUSSION
 
 9
 One of the more significant responsibilities assigned to the bankruptcy court in a Chapter X proceeding is to supervise the formulation of a plan of reorganization that is not only "feasible" but also "fair and equitable." See 11 U.S.C. §§ 574, 621(2). Central to the accomplishment of this task is the proper classification and ordering of the debtor corporation's creditors and stockholders: "For the purposes of the plan and its acceptance, the judge shall fix the division of creditors and stockholders into classes according to the nature of their respective claims and stock." 11 U.S.C. § 597; See Bankruptcy Rule 10-302(a).[7]
 
 
 10
 As explained by the Tenth Circuit in 1945, this classification of claims "is simply a method of recognizing difference in rights of creditors which calls for difference in treatment." Scherk v. Newton, 152 F.2d 747, 750. Once classified, the various classes must not only be ranked "according to the nature of their respective claims," but also according to the "absolute priority" rule. Under this rule, no class may receive anything of value until senior classes have received full compensation for the value of their claims. For example, creditors holding security interests in the assets of the debtor must be ranked ahead of all other creditors with respect to those assets. After the satisfaction of the secured creditors, general unsecured creditors are entitled to satisfaction before assets may be allocated to creditors whose interests have been subordinated, whether by express agreement or otherwise. Finally, after all creditors have been paid, provision may be made for stockholders. When the debtor is insolvent, the stockholders, as such, receive nothing. See Northern Pacific Ry. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913); Case v. Los Angeles Lumber Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939); Consolidated Rock Co. v. DuBois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982 (1941); Protective Committee v. Anderson, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). See also Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 435-38, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972) (Douglas, J., dissenting); See generally 6A Collier on Bankruptcy P 11.06. The question on this appeal, of course, is not whether Homex stockholders are entitled, as stockholders, to a portion of the proceeds that will result from the liquidation of Homex's assets. Because of the absolute priority rule, they are not. Rather, the question is whether persons who were allegedly induced by fraud to purchase Homex stock should be allowed, in a reorganization proceeding, to assert claims in such a way as to achieve parity with ordinary unsecured tort and contract claimants.[8]
 
 
 11
 Section 106(4) of the Bankruptcy Act, 11 U.S.C. § 506(4), defines "creditor" as "the holder of any claim." Section 106(1) of the Act,11 U.S.C. § 506(1), defines "claims" to "include all claims of whatever character against a debtor or its property, except stock, whether or not such claims are provable under section 103 of this title and whether secured or unsecured, liquidated or unliquidated, fixed or contingent." As noted in Collier :
 
 
 12
 The word "claims" as defined in § 106(1) is sweeping in scope. Within its purview is any character of a claim against the debtor or its property, whether or not such claim is provable under § 63 of the Act, and whether secured or unsecured, liquidated or unliquidated, fixed or contingent. This is, of course, a more inclusive definition than that applicable in ordinary bankruptcy, and it should be given a broad construction with respect to claims and creditors in order to dispose of all liabilities of the debtor in reorganization.
 
 
 13
 6 Collier on Bankruptcy P 2.05, at 306 (footnotes omitted). Thus, inasmuch as the stockholders on this appeal are basing their claims not on their ownership of stock certificates but on the alleged fraud that was perpetrated upon them by the corporation when they purchased those certificates, they are, at least arguably, "creditors" making "claims" for purposes of a Chapter X reorganization. With this Judge Burke seems to have agreed, for he referred to both "conventional general creditors" and "those creditors whose claims are grounded on fraud or securities law violations committed upon them as stockholders." See also In Re Four Seasons Nursing Centers of America, Inc., 472 F.2d 747, 749-50 (10th Cir. 1973). On this appeal we will assume, as Judge Burke did, without deciding, that defrauded stockholders are creditors within the meaning of the Bankruptcy Act, and we will consider the more narrow question whether it was inequitable for Judge Burke to subordinate the claims by the stockholders to those made by ordinary general creditors. We conclude that it was not.
 
 
 14
 In Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), the Supreme Court agreed to review a lower court decision "because of an apparent restriction imposed by that decision on the power of the bankruptcy court to disallow or to subordinate . . . claims in the exercise of its broad equitable powers." 308 U.S. at 296, 60 S.Ct. at 240. In the course of its opinion, the Court reaffirmed that " 'courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity.' " 308 U.S. at 304, 60 S.Ct. at 244, Quoting Local Loan Co. v. Hunt, 292 U.S. 234, 240, 54 S.Ct. 695, 78 L.Ed. 1230 (1934). Accordingly, the bankruptcy court is to apply "the principles and rules of equity jurisprudence." 308 U.S. at 304, 60 S.Ct. at 244. See also 11 U.S.C. § 11(a). The Court also said that among the powers available to the bankruptcy court to effect this mandate is the power of "subordination in light of equitable considerations." 308 U.S. at 305, 60 S.Ct. at 244.
 
 
 15
 The mere fact that an officer, director, or stockholder has a claim against his bankrupt corporation or that he has reduced that claim to judgment does not mean that the bankruptcy court must accord it Pari passu treatment with the claims of other creditors. Its disallowance or subordination may be necessitated by certain cardinal principles of equity jurisprudence.
 
 
 16
 308 U.S. at 306, 60 S.Ct. at 245. The Court also noted:
 
 
 17
 In the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate. And its duty so to do is especially clear when the claim seeking allowance accrues to the benefit of an officer, director, or stockholder. That is clearly the power and duty of the bankruptcy courts under the reorganization sections.
 
 
 18
 308 U.S. at 307-08, 60 S.Ct. at 246 (footnote omitted). See also In Re Four Seasons Nursing Centers of America, Inc., supra, 472 F.2d at 749 ("The reorganization court as a court of equity has broad powers in the matter of classifying creditors and shareholders, and it necessarily has full power to subordinate interests or classes of interests where the equities demand."); In Re Sixty-Seven Wall Street Restaurant Corp., 23 F.Supp. 672, 673, 674 (S.D.N.Y.1938).
 
 
 19
 Collier has made similar observations regarding subordination which are directly relevant to this appeal:
 
 
 20
 Creditors holding claims against the debtor's estate of a kind not secured within the meaning of the Act are classified as unsecured or general creditors. The fact that the claims may take various forms as, for example, notes, accounts, written contracts, torts or the like will not ordinarily compel separate classification since an unsecured indebtedness or liability is the common denominator of all.
 
 
 21
 Within the total group of unsecured creditors, however, there may be certain ones whose claims are of such a nature as to give them some right of priority or preference over other claimants. These creditors, then, must be separately classified and accorded the priority to which they are entitled.
 
 
 22
 6 Collier on Bankruptcy P 9.13, at 1620-21 (footnotes omitted).
 
 
 23
 Subordination is a means of regulating distribution results in reorganization by adjusting the respective order of claimants and stockholders to the equitable levels of the comparative claim positions in the proceeding. Its fundamental aim to is undo or offset any inequity in the position of a creditor or stockholder which will produce injustice or unfairness to the other creditors or stockholders in terms of reorganization results.
 
 
 24
 6 Collier on Bankruptcy P 9.15, at 1644-45. Given the broad equitable powers with which the bankruptcy court is endowed, and given the expectations that conventional creditors and investors have when they extend credit or invest, we cannot say that Judge Burke acted improperly.
 
 
 25
 Where the debtor corporation is insolvent and is about to undergo complete liquidation, the equities favor the conventional general creditors rather than the allegedly defrauded stockholders. In such circumstances, "(t)he real party against which (the stockholders) are seeking relief is the body of general creditors of their corporation. Whatever relief may be granted to them in this case will reduce the percentage which the general creditors will ultimately realize upon their claims." Scott v. Abbott, 160 F. 573, 581 (8th Cir.), Cert. denied, 212 U.S. 571, 29 S.Ct. 682, 53 L.Ed. 655 (1908). We will not allow stockholders whose claims are based solely on the alleged fraud that took place in the issuance of stock to deplete further the already meager pool of assets presently available to the general creditors. See also Matter of Cartridge Television, Inc., 535 F.2d 1388 (2d Cir. 1976) (straight bankruptcy); In the Matter of Crimmins, 406 F.Supp. 282 (S.D.N.Y.1975) (straight bankruptcy). In so deciding, we heed the observation made many years ago by the Eighth Circuit: "When a corporation becomes bankrupt, the temptation to lay aside the garb of a stockholder, on one pretense or another, and to assume the role of a creditor, is very strong, and all attempts of that kind should be viewed with suspicion." Newton National Bank v. Newbegin, 74 F. 135, 140 (8th Cir. 1896). We also note that, "(a)s a general rule equity prefers the claims of innocent general creditors over the claims of shareholders or subordinated creditors deceived by officers of the corporation." F.D.I.C. v. American Bank Trust Shares, Inc., 412 F.Supp. 302, 308 (D.S.C.1976), Vacated on other grounds, 558 F.2d 711 (4th Cir. 1977). See also Scott v. DeWeese, 181 U.S. 202, 213, 21 S.Ct. 585, 45 L.Ed. 822 (1901); Sanger v. Upton, 91 U.S. (1 Otto) 56, 60, 23 L.Ed. 220 (1875); Upton v. Tribilcock, 91 U.S. (1 Otto) 45, 47, 23 L.Ed. 203 (1875); Carter v. Bogden, 13 F.2d 90, 93-94 (8th Cir. 1926); Scott v. Abbott, supra, 160 F. at 582.
 
 
 26
 This general rule is altogether fitting. When persons or institutions lend money to a corporation, or otherwise become its creditors, they do so in reliance upon the protection and security provided by the money invested by the corporation's stockholders the so-called "equity cushion." In effect, when stock is purchased, the purchaser of that stock invites other segments of the business world to do business with the issuer. "This (reliance) is not only theoretically true, but common experience teaches that it is practically true also." Scott v. Abbott, supra, 160 F. at 582. The general creditors also rely on the absolute priority rule when deciding to extend credit: "The reliance need not be manifest the stockholders are presumed to have knowledge of priority rights. . . . Credit is given to corporations with little or no knowledge of names of stockholders, but with confidence that, whoever they are, their rights in and to corporate property are subordinate to the rights of creditors." Huff, The Defrauded Investor in Chapter X Reorganizations: Absolute Priority v. Rule 10b-5, 50 Am.Bankr.L.J. 197, 205 (1976).
 
 
 27
 As explained in a leading article on this question, Slain & Kripke, The Interface Between Securities Regulation and Bankruptcy Allocating the Risk of Illegal Securities Issuance Between Security Holders and the Issuer's Creditors, 48 N.Y.U.L.Rev. 261 (1973), there are two entirely distinct types of risks taken by creditors and investors when they decide to do business with a corporation: the risk of insolvency of the debtor and the risk of unlawful issuance of securities. Id. at 286. It is appropriate that both the general creditors and the investors assume the risk of insolvency. As between the creditors and the investors, however, only the investors should be forced to bear the risk of illegality in the issuance of stock.
 
 
 28
 In theory, the general creditor asserts a fixed dollar claim and leaves the variable profit to the stockholder; the stockholder takes the profit and provides a cushion of security for payment of the lender's fixed dollar claim. The absolute priority rule reflects the different degree to which each party assumes a risk of enterprise insolvency; no obvious reason exists for reallocating that risk.
 
 
 29
 Id. at 286-87. Slain and Kripke also note that "(i)t is difficult to conceive of any reason for shifting even a small portion of the risk of illegality (in the stock issuance) from the stockholder, since it is to the stockholder, and not the creditor, that the stock is offered." Id. at 288. With this we quite agree.
 
 
 30
 Finally, we note that the United States Congress is in the process of considering this very question as part of its review of the entire law of bankruptcy. Section 510 of H.R. 8200, 95th Cong., 1st Sess. (1978), which was passed by the House of Representatives on February 1, 1978, 124 Cong.Rec. at H. 457 (1978), provides as follows:
 
 Subordination of Claims
 
 31
 (a) After notice and a hearing, the court shall
 
 
 32
 (2) subordinate for purposes of distribution any claim for rescission of a purchase or sale of a security of the debtor or of an affiliate or for damages arising from the purchase or sale of such a security to all claims and interests that are senior or equal to the claim or interest represented by such security.
 
 
 33
 (b) Notwithstanding subsection (a) of this section, after notice and hearing, the court may, on equitable grounds
 
 
 34
 (1) subordinate for purposes of distribution all or part of an allowed claim or interest to all or any part of another allowed claim or interest. . . .
 
 
 35
 Section 510 of the parallel Senate bill, S. 2266, contains virtually identical language. S. 2266, 95th Cong., 1st Sess. (1977). The report on H.R. 8200 of the House Committee on the Judiciary, H.R.Rep.No.95-595, 95th Cong., 1st Sess. (1977), adopts substantially the point of view of the Slain & Kripke article. The Report explains that, under subsection (a), "(i)f the security is an equity security, the damages or rescission claim is subordinated to all creditors and treated the same as the equity security itself." Id. at 359. The Report explains that subsection (b) "is intended to codify case law, such as Pepper v. Litton . . . and Taylor v. Standard Gas and Electric Co., 10 Cir., 96 F.2d 693 . . . and is not intended to limit the court's power in any way. The bankruptcy court will remain a court of equity . . . . The court's power is broader than the general doctrine of equitable subordination, and encompasses subordination on any equitable grounds." Id. In general, the Report notes that, "(t)he general creditors have not had the potential benefit of the proceeds of the enterprise deriving from ownership of securities and it is inequitable to permit shareholders that have had this potential benefit to shift the loss to general creditors." Id. at 195. Although it is plain that we are not bound by this legislative activity, we find the reasoning behind it, supported by the Commission on the Bankruptcy Laws of the United States and the National Conference of Bankruptcy Judges, quite persuasive.
 
 
 36
 To decide in a way other than we decide today would not only violate our sense of simple fairness, it would unduly promote the policy of the federal securities laws to encourage full and fair corporate disclosure at the expense of the policy of Chapter X of the Bankruptcy Act to provide a "fair and equitable" distribution among the interested parties. This we decline to do.
 
 
 37
 The decision of the district court is affirmed.
 
 
 
 [1]
 Homex was incorporated on July 22, 1968, under the laws of the State of Delaware; its offices and manufacturing plant were located in New York. Shortly after incorporation, Homex made a private offering of 1.6 million shares at $1 each. On February 19, 1970, 1,175,000 shares of Homex common stock were sold publicly for $16.50 per share, out of which the corporation realized approximately $6.1 million. On July 29, 1971, 500,000 shares of Homex cumulative convertible preferred stock were sold publicly at $40 per share, and the corporation realized approximately $19 million. The corporation acquired additional funds by borrowing approximately $38 million from a consortium of nine banks, some of which are appellees on this appeal
 
 
 [2]
 The Securities and Exchange Commission filed a civil injunctive action against Homex and its officers in the United States District Court for the District of Columbia on July 2, 1975, alleging that they had violated federal securities laws by issuing false and misleading financial statements. The defendants neither admitted nor denied the Commission's allegations, but instead consented to the entry of permanent injunctions against future violations. Criminal indictments were returned against five key Homex officials in 1976 in the Southern District of New York, charging them with securities fraud, mail fraud and conspiracy. After a six-week jury trial, each defendant was convicted of each charge. These convictions were affirmed by this Court. United States v. Stirling, 571 F.2d 708 (2d Cir. 1978), Petition for cert. filed, 46 U.S.L.W. 3723 (U.S. May 1, 1978)
 
 
 [3]
 Original jurisdiction over proceedings under Chapter X of the Bankruptcy Act is vested in the district courts of the United States as courts of bankruptcy. See 11 U.S.C. §§ 1(10), 11, 502
 
 
 [4]
 Mr. Frank Raichle, the Reorganization Trustee, originally intended to formulate a plan of reorganization under which Homex would continue operations. Borrowing proved impossible, however, as did merger with or acquisition by a financially sound company. He thus began the Herculean task of liquidating Homex's assets. See 11 U.S.C. § 616(10); Bankers Life & Cas. Co. v. Kirtley, 338 F.2d 1006, 1009-10 (8th Cir. 1964); 6A Collier on Bankruptcy P 10.19. Of the over 18,000 modules manufactured by Homex before the petition for reorganization was filed, more than half were unsold; by March 31, 1977, all but a few had been sold under approximately 382 separate contracts. Mr. Raichle also sold land, raw materials, machinery, equipment and other assets and secured substantial federal and state tax refunds. As of May 31, 1977, Homex's unliquidated assets were estimated to be worth $3,749,634; cash and certificates of deposit amounted to $6,236,742. Finally, Mr. Raichle paid $7 million to the consortium of banks as an early and partial payment of the amount they will eventually receive under the reorganization plan. In exchange for this advance payment, the banks agreed to waive whatever security interests they had in Homex's assets security interests that Mr. Raichle disputed and to withdraw objections to the consolidation of the estates of Homex and its subsidiaries. Under this settlement, effected by court order, the banks assumed their present status as unsecured creditors
 The debt figure of $45,961,000 represents the aggregate of claims against the Homex estate to which Mr. Raichle has not objected. It includes the approximately $38 million owed to the bank consortium, less the $7 million which has already been paid, but it excludes substantially all stockholder claims based on alleged violations of the federal securities laws. In addition to the banks' claims, there are a variety of secured and unsecured claims, claims by former employees for wages and expenses, and claims advanced by federal, state and local taxing authorities.
 As of May 31, 1977, the estimated percentage distribution on the claims ranged between 30.46 percent and 34.81 percent absent any consideration for the stockholders' fraud claims.
 
 
 [5]
 On April 24, 1972, a class action complaint against Homex, its officers, and its auditors was filed by Homex stockholders in the United States District Court for the Southern District of New York alleging violations of federal securities laws and seeking damages. This complaint was eventually consolidated with other similar actions. The consolidated complaints alleged violations during the period of October 7, 1970, to July 10, 1972. See In Re Stirling Homex Securities Litigation, 388 F.Supp. 567 (Jud.Pan.Mult.Lit.1975). Because of a stay entered by Judge Burke prohibiting lawsuits against Homex, the consolidated complaint omitted the corporation as a defendant. See Bankruptcy Rule 10-601(a). On this appeal, the appellants note that "(t)he loss to shareholders, taking account of intermediate market fluctuations in excess of the offering prices, while difficult to estimate, could be as much as $100,000,000." Appellant's Brief at 5
 Mr. Raichle received seven claims filed by stockholders containing allegations that Homex made false and misleading statements upon which they relied when purchasing Homex stock. The total amount of these claims was over $30 million. On July 24, 1975, however, Judge Burke disallowed so much of these claims as was made on behalf of a "class" of claimants virtually all of the claims. Judge Burke explained that there is no provision in the Bankruptcy Act for the filing of claims in a reorganization proceeding on behalf of a class, a ruling not contested on this appeal, and that the individual members of the purported class had failed to file claims within the period of time defined by a previously-issued order barring claims not made before February 19, 1973. What remained were six claims by allegedly defrauded stockholders totaling $21,869. Two of those claims, totaling $6,563, were filed by certain appellants in this appeal; none was filed by the remaining appellants. There is a dispute on this appeal as to whether the claims of the individual stockholders should be barred. The order read in part as follows: "All proofs of claim of creditors against the debtors or their property, of whatever character, either in tort or in contract, fixed or contingent, liquidated or unliquidated, other than those founded on . . . shares of stock, shall be filed with the Trustee of the debtors . . . on or before February 19, 1973." In view of our disposition of the central issue on this appeal, we need not comment on the bar order.
 
 
 [6]
 Our appellate jurisdiction is based on § 24 of the Bankruptcy Act, 11 U.S.C. § 47, which provides as follows:
 The United States courts of appeals . . . are invested with appellate jurisdiction from the several courts of bankruptcy in their respective jurisdictions in proceedings in bankruptcy, either interlocutory or final, and in controversies arising in proceedings in bankruptcy, to review, affirm, revise, or reverse, both in matters of law and in matters of fact . . . .
 Except where inconsistent with Chapter X, the provisions of § 24 are applicable to appeals generated by reorganization proceedings. See 11 U.S.C. § 521; In Re Wingreen Co., 412 F.2d 1048, 1050-51 (5th Cir. 1969); 2 Collier on Bankruptcy P 24.45; 6 Collier on Bankruptcy P 3.40. "Under the present Act, the general rule is that an appeal from an order or decree entered in a 'proceeding in bankruptcy', either interlocutory or final, may be taken as of right, without any necessity for the securing of an allowance from the court of appeals." 2 Collier on Bankruptcy P 24.11(3) (footnote omitted). Judge Burke's order subordinating the stockholders' claims to the more conventional unsecured creditors' claims was issued during a "proceeding in bankruptcy." See id. at PP 24.12, 24.19.
 
 
 [7]
 The rule reads as follows:
 For the purposes of the plan and its acceptance, the court may fix, after hearing on such notice as it may direct, the division of creditors and stockholders into classes according to the nature of their respective claims and stock.
 
 
 [8]
 The Supreme Court has, on two occasions, left this question unanswered. See Protective Committee v. Anderson, 390 U.S. 414, 423 & n. 8, 453, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968); Tcherepnin v. Knight, 389 U.S. 332, 346, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). We do not consider the 1939 decision of Oppenheimer v. Harriman National Bank & Trust Co., 301 U.S. 206, 57 S.Ct. 719, 81 L.Ed. 1042 (1937), upon which the stockholders in this dispute rely, to be of controlling significance in Chapter X reorganization efforts. Mr. Oppenheimer bought stock in the Harriman bank in 1930. The bank closed in 1933, and, while it was being liquidated by the Comptroller of the Currency, Oppenheimer sued for rescission based on a claim of fraud and secured a money judgment for the amount he paid for his shares. The Second Circuit ordered that the judgment be paid only "after payment of all who were creditors when the bank became insolvent." 85 F.2d 582, 585. The Supreme Court reversed, holding that Oppenheimer's "judgment is entitled to rank on a parity with other unsecured creditors' claims." 301 U.S. at 215, 57 S.Ct. at 724 (footnote omitted). Significantly, the Oppenheimer decision, based on facts that occurred prior to federal securities legislation, was made not pursuant to the Bankruptcy Act but under an entirely different statutory scheme the National Bank Act, 12 U.S.C. § 1 Et seq. under which distribution is to be "ratable" rather than "fair and equitable." See 12 U.S.C. § 194
 There are, of course, a number of cases in which Trustees in Chapter X proceedings, faced with colorable claims made by allegedly defrauded stockholders, have decided to settle or compromise rather than litigate the position of such claimants. See In Re Equity Funding Corp. of America, 416 F.Supp. 132, 151 (D.C.Cal.), Aff'd, 519 F.2d 1274 (9th Cir. 1975); Huff, The Defrauded Investor in Chapter X Reorganizations: Absolute Priority v. Rule 10b-5, 50 Am.Bankr.L.J. 197, 215 (1976). The stockholders on this appeal admit, however, that there are no rulings that mandate parity participation in a reorganization plan by allegedly defrauded stockholders over a trustee's objection.