In re LOUISIANA INDUSTRIAL COATINGS, INC., Debtor.

LOUISIANA INDUSTRIAL COATINGS, INC., Debtor-in-Possession, Plaintiff,

v.

George PERTUIT, Defendant.

Bankruptcy No. 80–1371–K.

Adv. No. 81–0277–K.

United States Bankruptcy Court, E.D. Louisiana.

April 25, 1983.

P.J. Stakelum, III, Fred Clegg Strong, New Orleans, La., John C. Anderson, Baton Rouge, La., Edward James Gaidry, Houma, La., for debtor/plaintiff.

Raymond J. Brandt, New Orleans, La., J.B. Kiefer, Metairie, La., for defendant.

## MEMORANDUM OPINION AND REASONS FOR JUDGMENT

T. HARTLEY KINGSMILL, Jr., Bankruptcy Judge.

This cause came regularly on for trial on April 29, 1982 and June 7, 1982, on the

complaint of Louisiana Industrial Coatings, Inc., as Debtor-in-Possession, to avoid as preferential the redemption of fifty-one shares of its stock from George Pertuit. Although this trial was held prior to the expiration of the Supreme Court's stay of its decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* —— U.S. ——, 102 S.Ct. 2858, 2880, 73 L.Ed.2d 598 (1982), this Memorandum and Order is being entered after the effective date of that decision. Therefore, it is necessary as a threshold matter to determine, in light of that decision's *sequelae,* the status of this Court's jurisdiction and judgment in the case at bar.

In response to that decision, the Administrative Office of the United States Courts promulgated and circulated a draft of an Emergency Rule intended to address the jurisdictional hiatus left by Congress's inaction after the *Northern Pipeline* decision was handed down. At the urging of that Office, rules closely patterned on that draft have been adopted as local rules of the district courts in each federal judicial district. On December 21, 1982, the United States District Court for the Eastern District of Louisiana entered by Emergency Resolution its Local Bankruptcy Rule (hereinafter referred to as "the Emergency Rule"), which became effective by its own terms on December 25, 1982.

Paragraph (c)(1) of the Emergency Rule states: "All cases under title 11 and all civil proceedings arising under Title 11 or arising in or related to cases under Title 11 are referred to the bankruptcy judges of this district." Thus the Chapter 11 proceeding involving Louisiana Industrial Coatings, Inc. was, together with all other pending Title 11 cases, referred to this Court on December 25, 1982 when the Emergency Rule became effective. Along with that proceeding was referred the instant Adversary Proceeding which is on its face either a civil proceeding arising under Title 11 or arising in or related to a case under Title 11, within the meaning of the Emergency Rule.

Therefore, this Court may exercise in this proceeding the referral jurisdiction set forth in the Emergency Rule. The scope of that jurisdiction is defined by exclusion in paragraph (d)(1) of the Rule:

"(d) Powers of Bankruptcy Judges

"(1) The bankruptcy judges may perform in referred bankruptcy cases and proceedings all acts and duties necessary for the handling of those cases and proceedings except that the bankruptcy judges may not conduct:

"(A) a proceeding to enjoin a court;

"(B) a proceeding to punish a criminal contempt—

"(i) not committed in the bankruptcy judge's actual presence; or

"(ii) warranting a punishment of imprisonment;

"(C) an appeal from a judgment order, decree, or decision of a United States bankruptcy judge; or

"(D) jury trials."

The present proceeding falls within none of the exclusions laid down in subparagraphs (A) through (C). It is unnecessary to consider whether the jury exclusion of subparagraph (D) was or could have been applicable, because neither party to this adversary proceeding demanded a jury trial. Even if a right to a jury trial might have existed, failure to demand one timely waived any such right. Rule 9001(c), Suggested Interim Bankruptcy Rules; *cf.* Rule 38(d), Federal Rules of Civil Procedure.

■ The precise distinction between "civil proceedings arising under Title 11" and those "arising in or related to cases under Title 11" is important to the particular form of jurisdiction to be exercised by this Court in the case at bar. Paragraph (d)(3) of the Emergency Rule states in pertinent part:

"(3) (A) Related proceedings are those civil proceedings that, in the absence of a petition in bankruptcy, could have been brought in a district court or a state court. Related proceedings include, but are not limited to, claims brought by the estate against parties who have not filed claims against the estate. *Related proceedings do not include:* contested and

uncontested matters concerning the administration of the estate; allowance of and the objection to claims against the estate; counterclaims by the estate in whatever amount the persons filing claims against the estate; orders in respect to obtaining credit; orders to turn over property of the estate; *proceedings to set aside preferences and fraudulent conveyances;* proceedings in respect to lifting of the automatic stay; proceedings to determine dischargeability of particular debts; proceedings to object to the discharge; proceedings in respect to the confirmation of plans; orders approving the sale of property where not arising from proceedings resulting from claims against the estate; and similar matters. A proceeding is not a related proceeding merely because the outcome will be affected by state law.

"(B) In related proceedings the bankruptcy judge may not enter a judgment or dispositive order, but shall submit findings, conclusions, and a proposed judgment or order to the district judge, unless the parties to the proceeding consent to entry of the judgment or order by the bankruptcy judge." [Emphasis supplied.]

Thus the present adversary proceeding, which is in essence one seeking to avoid a preference or fraudulent conveyance, is one expressly within the core of traditional bankruptcy jurisdiction that is excluded from the concept of "related proceedings" by paragraph (d)(3)(A) of the Emergency Rule. Further, because it is embraced within such a core function, the present controversy is to be disposed of by this Court's own judgment pursuant to paragraph (d)(2) of the Emergency Rule and not by the submission of proposed findings of fact, conclusions of law and judgment to the district court pursuant to paragraph (d)(3)(B) of that Rule. *Cf. Northern Pipeline, supra,* 102 S.Ct. at 2871. In this connection, it is to be noted that in *Katchen v. Landy,* 382 U.S. 323, 325 & 333–35, 86 S.Ct. 467, 470 & 474–75, 15 L.Ed.2d 391 (1966), the Supreme Court expressly recognized and upheld the bankruptcy judges' long-

time exercise of jurisdiction over preference adjudications.

## A.  *Factual Context.*

Louisiana Industrial Coatings, Inc. ("LIC") filed a voluntary petition for relief on September 30, 1980, under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101, *et seq.* (1979), and pursuant to the normal practice in this District and the intent of the Code, 11 U.S.C. § 301, an Order for Relief was entered that same day.

Louisiana Industrial Coatings, Inc. was organized as a Louisiana corporation on April 9, 1973, and thereafter conducted a business as a surface preparation and painting contractor in and around St. Charles Parish, Louisiana. As of January 1980, George Pertuit ("Pertuit"), the defendant in the instant action, was president of LIC, a director thereof and owned 51% of the outstanding common stock of the corporation. Earl E. Clements ("Clements") was vice president of LIC, a director thereof and owned 49% of the outstanding common stock. It appears that the division of functions between the officers was a usual one in which Pertuit managed the field end of the contracting business, including the supervision of individual jobs and bidding, and that Clements managed the administrative end of the business from the office.

On January 23, 1980, LIC and Pertuit entered into an agreement whereby LIC redeemed Pertuit's stock for more than $65,000 in stated consideration. Pertuit's stock thus became the property of the corporation, as treasury stock, and Clements' holdings became the sole stock in the company issued and outstanding. Pertuit resigned his offices as president and director and Clements was left as a result of the transaction as the sole officer, director and shareholder of the company.

Clements thereupon assumed the office of president and took over the management of both the outside and inside ends of the business. However, the state of the business declined to the point where, as said above, a voluntary petition for relief was filed on September 30, 1980.

On November 12, 1981, LIC filed the instant adversary proceeding against Pertuit, alleging that at the time of the redemption of Pertuit's stock it was insolvent and alleging in the alternative that the redemption rendered the company insolvent. The complaint further alleged that the redemption was a transaction voidable pursuant to sections 544, 547 and 548 of the Bankruptcy Code as well as pursuant to La.Rev.Stat. 12:55 A. The complaint sought the return to LIC of the consideration paid by it to Pertuit for the redemption of his stock.

### B. *Findings of Fact.*

After hearing the testimony adduced at trial, observing the demeanor of the witnesses and reviewing the exhibits admitted into evidence, and after carefully weighing that evidence and the inferences that may reasonably be drawn therefrom, the court makes the following specific findings of fact. To the extent that any of the later conclusions of law are more properly findings of fact, they are also incorporated herein by reference.

1. Louisiana Industrial Coatings, Inc. ("LIC") is a corporation organized under the laws of the State of Louisiana on April 9, 1973, pursuant to articles of incorporation dated April 2, 1973.

2. On September 3, 1980, LIC filed a petition for relief under Chapter 11 of the Bankruptcy Code.

3. George Pertuit ("Pertuit") is a person of the full age of majority, domiciled in and resident of the Parish of St. Charles, State of Louisiana, within the Eastern District of Louisiana.

4. At all material times prior to the stock redemption at issue, Pertuit was president and a director of LIC.

5. Further, at all material times prior to the stock redemption at issue, Pertuit owned not less than 51 shares representing not less than 51% of the outstanding LIC common stock.

6. Earl E. Clements ("Clements") is a person of the full age of majority, domiciled in and resident of the Parish of St. Charles, State of Louisiana, within the Eastern District of Louisiana.

7. Immediately prior to the stock redemption at issue, Clements was the vice president of LIC and owned 49 shares representing 49% of the outstanding LIC common stock.

8. Subsequent to the stock redemption at issue, Clements was the president and a director of LIC; his 49 shares of common stock then represented 100% of the LIC common stock outstanding.

9. On January 23, 1980, LIC and Pertuit executed an agreement pursuant to which LIC redeemed the 51 shares of LIC common stock owned by Pertuit.

10. In consideration of the redemption of his stock, Pertuit received property valued at $76,723.10, consisting of a cash payment of $25,000, a $40,000 promissory note and his company automobile. Additionally, LIC maintained Pertuit as an insured on its group hospitalization and life insurance programs. Clements guaranteed the $40,000 promissory note issued by LIC to Pertuit.

11. At the time of the stock redemption, LIC was insolvent, the aggregate fair market value of its assets being then substantially less than the sum of its liabilities.

12. Moreover, even if LIC had not been insolvent immediately prior to the stock redemption, its overall position was so precarious that it would have been rendered insolvent by the stock redemption, which had the effect of reducing its capital by $76,723.10.

13. Moreover, the property remaining to LIC after the redemption represented an unreasonably small capital in light of its existing business.

14. Moreover, the property remaining to LIC after the redemption represented an unreasonably small capital for carrying on the business that LIC could reasonably have been anticipated to embark on thereafter.

15. Had the redemption not taken place and had these proceedings been a liquidation case, LIC's stockholders would have

received nothing in the distribution of LIC's assets.

16. Because of his position, duties and long association with LIC and his lengthy experience as a painting contractor, Pertuit either knew or should have known of the financial difficulties LIC faced prior to and at the time of its redemption of his stock.

17. Further, Pertuit either knew or should have known both that LIC was then insolvent and further that LIC's financial condition was so weak immediately prior to the stock redemption, that even had LIC then been solvent, that the stock redemption would have rendered it insolvent.

18. In addition to the cash payment of $25,000 made to him by LIC on January 23, 1980, Pertuit also received from the company 21 weekly payments on its $40,000 promissory note totalling $11,150.00. Pertuit further received the use of his company-owned automobile, which he later abandoned when it allegedly developed mechanical trouble. The automobile was subsequently repossessed by the leasing company that held the legal title to the automobile. LIC also made payments of approximately $1,500 for Pertuit's account for insurance and automobile lease payments.

## C. Conclusions of Law.

Based upon the foregoing facts found and from its review of the Code, the statutes and the pertinent authorities, the court reaches the following conclusions of law. To the extent that any of the foregoing findings of fact are more properly conclusions of law, they are also incorporated herein by reference.

1. *This Court has jurisdiction of the parties and of the subject matter of this adversary proceeding.*

This Court has jurisdiction over the person of the plaintiff by virtue of its filing of its petition for relief as well as by virtue of its filing of the instant complaint. The record reflects that proper service was made upon the defendant, who in any event made a general appearance herein by appearing and answering the complaint. The Court therefore has jurisdiction of the persons of both parties.

This Court further has jurisdiction of the subject matter of the dispute pursuant to 11 U.S.C. §§ 541 and 542, 28 U.S.C. §§ 1471 and 1481 and the Emergency Rule as set out at the beginning of this opinion.

2. *The redemption by LIC of Pertuit's stock in that corporation was a transfer avoidable under section 544 of the Bankruptcy Code.*

That section provides, in pertinent part:

"(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

"(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained a judicial lien, whether or not such a creditor exists;

"(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; . . . ."

11 U.S.C. § 544.

■ The trustee's avoiding power is, of course, vested in the debtor in possession by 11 U.S.C. § 1107. Also, at this late date it should go unquestioned and almost without necessity of citation of authority that the effect of section 544 is to confer upon the trustee or debtor in possession the full gamut of remedies that applicable state law make available to any creditor of the debtor, who might be in a position to assert them, whether any such creditor actually exists or not. *McKay v. Trusco Finance*

*Co.*, 198 F.2d 431 (5th Cir.1952); 2 L. King, ed., Collier Bankruptcy Manual ¶ 544.04 (3d Ed.1982).

Article 1970 of the Louisiana Revised Civil Code of 1870, as most recently amended, gives to the representatives of all creditors where there has been a cession of the debtor's goods an action to annul any contract made in fraud of their rights. That article states that "[e]very contract shall be deemed to have been made in fraud of creditors, when the obligee knew that the obligor was in insolvent circumstances, and when such contract gives to the obligee, if he be a creditor, any advantage over other creditors of the obligor." In the instant case, Pertuit (the obligee) knew that LIC (the obligor) was in insolvent circumstances. But for the contract, Pertuit would not have been paid in preference and priority to LIC's other creditors.

For these purposes, Louisiana law uses a definition of insolvency very similar to that set out in the Bankruptcy Code.

"*Insolvency, definition and proof.* By being in insolvent circumstances is meant, that the whole property and credits are not equal in amount, at a fair appraisement, to the debts due by the party. And if he, who alleges the insolvency shows the amount of debts, *it is incumbent on the other party to show property at an equal or greater amount....*" [Emphasis supplied].

La.Civ.Code, art. 1985.

In the instant case, LIC has adequately demonstrated to the court the severity of its debts. Thus, it was incumbent upon Pertuit to show that LIC had assets in excess of the amount of its debts. This Pertuit has failed to do. In addition to the statutory burden placed on Pertuit, LIC has proven convincingly that its assets at fair value did not exceed the amount of its debts. Further, another ground for relief is provided by the Louisiana Business Corporation Law:

"A. *A corporation shall not purchase or redeem its shares when it is insolvent or when such purchase price would render it insolvent ....*" [Emphasis supplied.]

La.Rev.Stat. 12:55.

The term "insolvency" is defined as:

"... the inability of a corporation to pay its debts as they become due in the usual course of business."

La.Rev.Stat. 12:1(L).

In a leading case in this area, the Louisiana Fourth Circuit Court of Appeal held:

"Assuming that a valuation of the stock can be determined, *the rights of corporate creditors may not be prejudiced by diverting corporate assets to redeem stock if the corporation is insolvent, or when such redemption will render it insolvent.*"

*Collins v. Universal Parts Co.,* 260 So.2d 702, 705 (La.App. 4th Cir.1972) [Emphasis supplied.]

In *Collins,* a stockholder of a corporation had, prior to his death, entered into an agreement whereby the corporation was bound to purchase his stock in the event of his death, and his heirs and estate were similarly bound to sell his stock. This agreement was funded by a life insurance policy on the stockholder's life. Subsequently, the stockholder died and the corporation collected the proceeds of the policy. However, when the heirs demanded that the corporation purchase the decedent's stock per the agreement, the corporation was in receivership. The appellate court remanded the case to the trial court, with these instructions:

"The record reflects that the trial court failed to make a find of fact relative to the insolvency of the corporation. Such a finding is imperative in the instant case. Should the trial court determine that the corporation is insolvent the corporation may not be forced to purchase the decedent's stock regardless of the terms of the agreement at the present time."

260 So.2d at 705.

In order to apply the *Collins* principles and avoid this redemption, this Court need only examine the financial statements of LIC and the evidence previously discussed

because the insolvency of the corporation is readily apparent. Additionally, the Court notes that LIC has been unable to pay the vast majority of its debts as they became due, thus satisfying the state law of insolvency. Both Pertuit and Clements testified that even prior to the stock redemption, accounts payable incurred in the usual course of business could not be paid until at least 60 to 90 days past due. This was particularly true after the stock redemption.

Pertuit has argued that LIC was not insolvent because it paid *some* of its debts on time. The implication that a corporation is not insolvent because it has paid some items, for example salaries and taxes, more or less on time, while all of its other debts are in arrears, would seriously distort the realities and practicalities of doing business. Payments of such expenses as payroll and taxes are absolutely necessary to the immediate short-term survival of the corporation. If such expenses are not paid, either the employees would quit or a governmental agency would close the business down; the effect of either would be total and immediate cessation of the business without any hope whatsoever of rehabilitation.

In the instant case, LIC, despite being seriously in debt and functionally insolvent, attempted to operate a going concern for a period of approximately seven months, in the hopes of turning the business around and making it again as profitable as it had been before the transaction with Pertuit. The effect of the defendant's argument then is to say that LIC is not and never was insolvent merely because it tried to stave off the inevitable. In the very simplest of terms, LIC was broke both before and after the stock redemption. LIC attempted for a period of time, to carry on business and regain profitability, without success, but that in nowise demonstrates its solvency on January 23, 1980 or, indeed, at any other point in its long decline.

■ LIC is therefore entitled to avoid the transfer to Pertuit of the consideration paid him for the redemption of his stock and thereby is entitled under the state law im-posed by § 544 to the turnover by him to it of that consideration.

3. *The redemption by LIC of Pertuit's stock in that corporation was a preference avoidable under section 547 of the Bankruptcy Code.*

That section provides in pertinent part: "(b) ... [T]he trustee may avoid any transfer of property of the debtor—

" ...

"(1) to or for the benefit of a creditor;

"(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

"(3) made while the debtor was insolvent;

"(4) made—

" ...

"(B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—

"(i) was an insider; and

"(ii) had reasonable cause to believe the debtor was insolvent at the time of the transfer; and

"(5) that enables such creditor to receive more than such creditor would receive if—

"(A) the case were a case under chapter 7 of this title;

"(B) the transfer had not been made; and

"(C) such creditor received payment of such debt to the extent provided by the provisions of this title."

11 U.S.C. § 547.

All of the necessary elements under this section inhere in the transaction at bar.

a. *Transfer To Or For The Benefit Of A Creditor*—As a stockholder of LIC, Pertuit had a claim against LIC for his proportionate share of the corporate equity upon its dissolution or liquidation. Additionally, under the installment agreement, Pertuit ceased to be a stockholder and instead became a creditor with respect to the obligations owed him by LIC. The definition of a

"creditor" for this as for all other purposes under the Code is given in section 101(9): "'creditor' means [an] entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor". In the present instance, the confection of the stock redemption agreement created a claim for the recited consideration in favor of Pertuit and against LIC; Pertuit thereby became a creditor for the purpose of sections 101(9) and 547(b). Cf. In re Roco Corporation, 15 B.R. 813, 5 C.B.C.2d 921, 928–29 (Bankr.D. R.I.1981). In Matter of Stirling Homex Corp., 579 F.2d 206, 212 (2d Cir.1978), cert. den., 439 U.S. 1074, 99 S.Ct. 847, 59 L.Ed.2d 40 (1979) (stockholders whose claims were not purely for the return of their equity investment were treated as "creditors".

Furthermore, while it has been held that shareholders of a corporation, as such, were not "creditors" of the corporation under the relevant provisions of the old Bankruptcy Act, In re Eureka Anthracite Coal Co., 197 F. 216, 217 (W.D.Ark.1912), upon the confection of the redemption agreement and the transfer of his shares to the corporation, Pertuit ceased to be a shareholder. With this in mind, and where none of the exceptions contained in section 547(c) apply, there is available no other statutory category other than that of "creditor" to which Pertuit can be assigned to explain his relationship to and receipt of funds from the debtor in the period immediately preceeding the filing of the latter's petition for relief.

b. *For Or On Account Of An Antecedent Debt*—Again, the execution of the installment agreement established a debtor-creditor relationship between LIC and Pertuit. The subsequent payments pursuant to this agreement constituted payments on an antecedent debt. The only means by which the payments pursuant to the redemption transaction could be viewed as other than payments on an antecedent debt would be if the transaction as a whole qualified as a contemporaneous exchange of value subject to the exception contained in section 547(c)(1) or as a payment in the ordinary course of business subject to the exception contained in section 547(c)(2).

The key requirement of section 547(c)(1) is that the party dealing with the debtor have given "new value" to the debtor. 11 U.S.C. § 547(c)(1)(A). This requirement implies at a minimum some reasonable equivalence of value in the considerations flowing from the debtor to the creditor and vice versa. In re O'Neill Enterprises, Inc., 359 F.Supp. 940, 943 (W.D.Va.1973); In re Hygrade Envelope Corp., 272 F.Supp. 451, 458 (E.D.N.Y.1967), rev'd on other grounds, 393 F.2d 60 (2d Cir.1968), cert. den., 393 U.S. 837, 89 S.Ct. 114, 21 L.Ed.2d 108 (1968). Where this court has expressly found as a matter of fact that the corporation was insolvent at the time of the transfer (Finding of Fact No. 11), the consideration given the corporation by Pertuit, viz., his stock, was worthless. On the other hand, the consideration given by the corporation to Pertuit had substantial value. (Finding of Fact No. 10). Thus the necessary equivalence of value was utterly lacking so that the stock redemption transaction could in no sense be viewed as either a "contemporaneous exchange" or for "new value".

Finally, it goes almost without saying that a corporation's redemption of more than half of its issued and outstanding stock is not a transfer "in the ordinary course of business." Rather, the context clearly restricts the ordinary course of business to ordinary and necessary running expenses of the debtor's business, of types and amounts that the debtor had theretofore made a practice of paying. In re Union Feather & Wool Mfg. Co., 112 F. 774, 777 (7th Cir.1902); In re Columbia Real Estate Co., 205 F. 980, 982 (D.N.J.1913); In re Perlhefter, 177 F. 299, 304 (S.D.N.Y.1910). That apparently no appellate tribunal has had occasion to consider the cited proposition in more than seventy years is a good indication of its well-settled state.

c. *Made While The Debtor Was Insolvent*—The issue of LIC's insolvency prior to the stock redemption has been resolved by a specific Finding of Fact (no. 11, *supra*). Suffice it to say that, at the time of the stock redemption, LIC was in fact in a

negative capital position and was in fact insolvent. As noted before, for the purpose of determining insolvency, section 547 uses the traditional test of insolvency set forth in the definition section of the Code:

"(26) 'insolvent' means—

"(A) with reference to an entity other than a partnership, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

"(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

"(ii) property that may be exempted from property of the estate under section 522 of this title; . . . ."

11 U.S.C. § 101.

d. *Made To An Insider Who Had Reasonable Cause To Believe The Debtor Was Insolvent*—With respect to a corporation, section 101(25) of the Bankruptcy Code, 11 U.S.C. § 101(25), defines an "insider" as a director, officer or person in control of the debtor, among other persons. In the instant case, Pertuit was the President and a director of LIC. He was also then a 51% stockholder and had been such for at least several years prior to the redemption of his stock. Thus, he was also a controlling person of LIC.

This court has found as a matter of fact that Pertuit also had reasonable cause to believe that LIC was then insolvent. (Findings of Fact Nos. 16 & 17.) At the trial of this matter, Pertuit testified that he had been associated with LIC since its formation in 1973. At all times from and after its formation and prior to the redemption, he had served as LIC's president and, from shortly after its formation, been the majority stockholder holding not less than 51% of the outstanding stock. Pertuit further testified that in his capacity as president of LIC, he was responsible (to the exclusion of Clements) for LIC's field operations. If something in the field was amiss, if a problem was encountered on a job, it was Pertuit's responsibility to detect and solve the problem. Pertuit was also ultimately re-

sponsible for all bid quotations submitted by LIC. In this capacity, Pertuit had a far better understanding than did Clements of the status of LIC's work in the field.

Pertuit further testified that in addition to his responsibilities for the field work, he reviewed invoices, ordered materials, and participated in the general management of the company. He stated that he could look at a job and tell immediately whether it was being handled profitably. He also stated that, even without studying the financial statements, he knew whether or not LIC was making money based upon the progress of its field operations.

Pertuit also had access to all financial statements of LIC. Although the December 31, 1979 and January 31, 1980 financial statements had not been prepared by the time of the stock redemption on January 23, 1980, he did have access to the November 30, 1979 financial statement, which was delivered to LIC on or about January 8, 1980, over two weeks prior to the stock redemption.

The November 30, 1979 financial statement is significant in several material respects. First, that statement disclosed a significant operating loss. In addition, the net worth of the company at November 30, 1979 was less than the value of the consideration due Pertuit upon the redemption of his stock.

The November 30, 1979 financial statement disclosed that LIC lost $30,884.08 during the month of November, 1979, alone and that LIC had lost $60,526.12 since the beginning of its fiscal year on September 1, 1979. The November operating loss reduced LIC's net capital (or net stockholders' equity) to just $55,948.93, substantially less than the amount needed to redeem his stock.

In view of Pertuit's testimony as to his experience in the industrial painting field and his ability to determine whether or not the company was making money based upon the progress of its field work, he should have known that December and January would be very slow months in the

painting business due to inclement weather, holidays, *etc.* In fact, December, 1979, and January, 1980 were such slow months that LIC lost an additional $69,185.62 during those two months alone.

Thus, on the basis of the information available to Pertuit, he knew or should have known that the corporation did not have adequate capital on hand at November 30, 1979, with which to redeem his stock. Moreover, he knew or should have known that, in view of the consistent pattern of losses sustained by LIC during that fiscal year and the seasonal problems inherent in field work conducted in December and January, it was highly unlikely that LIC would have had sufficient capital on hand by late January with which to redeem his stock.

■ e. *That Enables The Creditor To Receive A Greater Benefit*—The final requirement is that Pertuit must have received more by virtue of the transfer at issue than he would have if he had received a liquidating distribution in a Chapter 7 proceeding. In view of the claims filed in this matter by the Bank of St. Charles and other creditors and this Court's earlier judgment in favor of Boh in another adversary proceeding filed against LIC, it is accurate to say that stockholders of LIC would not have received any sort of distribution whatsoever. This conclusion is compelled by the well-recognized rule of distribution set forth in section 726, according to which payments to the debtor are classified in the sixth and last priority. This accords with notions of equity and with the pervasive policy of the bankruptcy regime, illustrated, for example, by the rule of "absolute priority", under which no class of claims may receive anything of value in a distribution until senior classes have received full compensation for the value of their claims. *See, e.g. In re Stirling Homex Corp.*, 579 F.2d 206, 211 (2d Cir.1978), *cert. den.*, 439 U.S. 1074, 99 S.Ct. 847, 59 L.Ed.2d 40 (1979). Inasmuch as equity security holders rank junior to other creditors, they cannot receive any distribution until the priority, secured and general unsecured creditors are satisfied in full. *Northern Pacific Railway Company v. Boyd*, 228 U.S. 482, 508 n. 71, 33 S.Ct. 554, 561 n. 7, 57 L.Ed. 931 (1913).

Thus, the fact that Pertuit has already received approximately $37,650 in cash (consisting of $25,000 received on January 23, 1980, $11,150 in subsequent payments on the note, and $1,500 in insurance and lease payments) and a $40,000 note more than satisfies this requirement.

3. *The redemption by LIC of Pertuit's stock in that corporation was a transfer avoidable under section 548 of the Bankruptcy Code.*

Section 548(a) of the Bankruptcy Code provides:

"(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor—

"(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer occurred or such obligation was incurred, indebted; or

"(2) (A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

"(B) (i) was insolvent on the date that such transfer was made or became insolvent as a result of such transfer or obligation;

"(ii) was engaged in business, or was about to engage in business or a transaction, for which any property was an unreasonably small capital; or

"(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured."

11 U.S.C. § 548.

LIC's entitlement to relief under Section 548(a) is therefore predicated upon proof of the following:

1. The transfer of LIC's interest in property occurred within one year of

the filing of the petition or the obligation with respect to which relief is sought was incurred within one year of the filing of the petition;

2. LIC received less than a reasonably equivalent value in exchange for the transfer or obligation; *and*

3. LIC either (a) was insolvent on the date that the transfer was made or the debt was incurred or was rendered insolvent as a result thereof, or (b) was engaged in business, or was about to engage in business or in a transaction, for which any property remaining with LIC was an unreasonably small capital.

Each of these requirements is analyzed in further detail *infra.*

a. *The One-Year Requirement*—In the instant case, the petition was filed on September 3, 1980. Since the stock redemption did not occur until January 23, 1980, all transfers of property by LIC and all debts incurred by LIC in connection with the stock redemption fall easily within the one year prescribed by Section 548(a).

b. *Reasonably Equivalent Value*—There is also little doubt that LIC received less than reasonably equivalent value. On the one hand, LIC transferred to Pertuit consideration valued at $76,723.10, consisting of $25,000 in cash, a $40,000 promissory note, and an automobile valued at $11,723.10. LIC also expended approximately $1,500 in insurance payments and automobile lease payments. (Findings of Fact No. 10). Even if the automobile's value were discounted to reflect the defendant's subsequent abandonment of the vehicle due to alleged mechanical defects, and the insurance and lease payments were ignored, the property transferred by LIC and the obligations incurred by LIC would still be fairly valued at not less than $65,000. In exchange for this consideration, LIC acquired 51 shares of its own stock—stock that was virtually worthless due to LIC's financial condition at the time. (Finding of Fact No. 11). *See In re Roco Corporation,* 15 B.R. 813, 5 C.B.C.2d 921 (Bankr.D.R.I.1981), where the Bankruptcy Court, on facts simi-

lar to those of the case at bar, held that a stock redemption which occurred within one year of the date of the filing of the petition and rendered the debtor insolvent could be avoided under the similar provisions of section 547(a) of the Bankruptcy Code. *See also* the discussion in connection with section 547, *supra.*

c. *The Alternate Requirements of Insolvency or Inadequate Capitalization*—The final element of an action under section 548(a) requires proof that LIC was either insolvent on the date of the stock redemption (or was rendered insolvent by the stock redemption) *or* that LIC was engaged in business (or was about to engage in business) for which its remaining property represented an unreasonably small capital.

For this purpose, section 548(a) utilizes the statutory definition of insolvency found in Section 101(26) of the Code, which is quoted at length above in connection with the discussion of section 547. To reiterate briefly, the evidence clearly established that LIC was in a *negative* capital position on the date of the stock redemption. However, even if any doubt could have existed on this point, the $76,723.10 reduction in capital occasioned by the stock redemption would certainly have rendered LIC insolvent. Thus, the first aspect of this alternate test has been met.

The second aspect of this test has also been met—namely, that LIC was then engaged in business for which its remaining assets represented an unreasonably small capital. Again, the documentary evidence and testimony offered at trial clearly established that LIC was in a *negative* capital position both before and after the stock redemption. Moreover, its income statements for that fiscal year show a pattern of consistent and substantial operating losses. The Boh subcontracts and the Orleans Equipment Co. liability are simply further illustrations of how poor LIC's financial condition was at that time. A *negative* capital position represents *ipso facto* an unreasonably small capital with which to do *any* business. However, even if the court might have concluded that the value of

LIC's assets exceeded the amount of its debts, the amount of any such excess would be relatively insignificant in relation to LIC's business and would certainly have constituted an unreasonably small capital for purposes of Section 548(a).

### 4. *Conclusion.*

From the foregoing Findings of Fact and Conclusions of Law, the Court is of the opinion that the plaintiff, Louisiana Industrial Coatings, Inc., is entitled to the relief sought in its complaint. Not only does this Court have jurisdiction of the parties and of the subject-matter of the dispute, but this Court is a court of equity, 28 U.S.C. § 1481, and has full power to issue any order, process, or judgment that is necessary to effectuate that jurisdiction, 11 U.S.C. § 105(a).

The granting of the relief to which the debtor is entitled requires the full and complete recision of the stock redemption agreement of January 23, 1980 and the return to LIC of all consideration provided by it to Pertuit. Accordingly, a separate judgment will be entered decreeing:

1. Rescision of the stock redemption agreement dated January 23, 1980 between Louisiana Industrial Coatings, Inc., and George Pertuit;

2. A money judgment in the sum of $37,650, consisting of the $25,000 paid to Pertuit on January 23, 1980, $11,150 paid to Pertuit in 21 weekly payments representing installment payments on the promissory note, and $1,500 representing the approximate amount expended for Pertuit's account for insurance and lease payments on the automobile;

3. The $40,000 promissory note dated January 23, 1980 drawn by Louisiana Industrial Coatings, Inc. in favor of George Pertuit to be null and void, unsupported by consideration and of no further validity and further directing Pertuit to return the said promissory note to LIC marked "CANCELLED";

4. Pertuit liable to Louisiana Industrial Coatings, Inc. and any guarantor of or party to the said $40,000 promissory note for any damage sustained by LIC or any such guarantor or party by virtue of Pertuit's delay or failure to return the said promissory note to LIC marked "CANCELLED"; and

5. Awarding Louisiana Industrial Coatings, Inc. judicial interest from date of filing, and for all costs of this action.